**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Rugerio VALDIOSERA–GODINEZ and**
**Alejandro Garcia–Gil, Defendants–**
**Appellants.**

No. 90–8212
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

May 23, 1991.

Charles Louis Roberts, El Paso, Tex., for Garcia–Gil.

Rugerio Valdiosera–Godinez, Lompoc, Cal., for Valdiosera–Godinez.

LeRoy Morgan Jahn, Mark R. Stelmach, Asst. U.S. Attys., Ronald F. Ederer, San Antonio, Tex., for the U.S.

Before JOLLY, HIGGINBOTHAM, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Defendants-appellants Rugerio Valdiosera–Godinez and Alejandro Garcia–Gil, along with co-defendant Francisco Javier Garcia–Pescador, were tried before a jury in the United States District Court for the Western District of Texas and convicted of possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to commit this offense, in violation of 21 U.S.C. § 846. Both appellants challenge their convictions, and Garcia–Gil challenges his sentence. We affirm.

Responding to a telephone tip from an anonymous caller, the United States Cus-

toms Service dispatched two agents to the Rhino Self Storage at the intersection of Lear and Lockheed in El Paso, Texas. The caller had reported three Hispanic males and two cars with Mexican license plates in the vicinity of storage unit B–29, concluding that the three were either stripping the cars or unloading dope. Agents Daniel Urbina and Curtis Compton approached unit B–29 and parked their car seven or eight feet from the entrance. Agent Urbina announced in Spanish that he was a federal agent and asked if he could speak with the defendants. He then asked each defendant individually if the white Chevrolet parked outside the storage unit belonged to him; all denied it. At this time, an El Paso Police Department officer arrived and parked his patrol car away from the storage unit behind the customs agents' automobile.

Agent Urbina then asked each defendant individually three more questions: is the white Chrysler Dart parked inside the storage unit yours? is this storage garage yours? and, do you mind if I search? Each defendant answered all three questions in the negative. Upon searching the storage unit and the car within, the agents discovered a number of packages wrapped in white plastic and containing white powder. A field test of the powder revealed it to be cocaine. Agent Compton then arrested the defendants, and Agent Urbina read them their rights, again in Spanish. The total cocaine seized weighed 66½ pounds and was determined to have a purity of 91%, giving it a street value of approximately $500,000. The defendants moved to suppress the cocaine as seized in violation of the Fourth Amendment. The district court denied this motion.

## I.

### DEFENDANT VALDIOSERA–GODINEZ

#### A. *Sufficiency of the Evidence*

Valdiosera–Godinez first argues that the evidence to convict him of possession of cocaine and conspiracy to possess it was insufficient. As to the substantive offense, "the government must prove beyond a rea-

sonable doubt that the defendants knowingly possessed [cocaine] and intended to distribute it. Possession may be actual or constructive, may be joint among several defendants, and may be proved by direct or circumstantial evidence." *United States v. Gardea Carrasco*, 830 F.2d 41, 45 (5th Cir.1987). As to the offense of conspiracy,

the government must prove beyond a reasonable doubt: (1) the existence of an agreement between two or more persons to violate the narcotics laws; (2) the defendant knew of the conspiracy; and (3) the defendant voluntarily participated in the conspiracy. Each element of the conspiracy charge must be proved beyond a reasonable doubt. No element need be proved by direct evidence, but may be inferred from circumstantial evidence. An agreement may be inferred from "concert of action." Voluntary participation may be inferred from "a collocation of circumstances."

*United States v. Arzola–Amaya*, 867 F.2d 1504, 1511 (5th Cir.) (citations omitted), *cert. denied*, —— U.S. ——, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989).

The government's case against Valdiosera–Godinez rested entirely on circumstantial evidence. After examining the record, however, we conclude that a rational trier of fact, viewing this evidence in the light most favorable to the government, could have found the elements of the two offenses beyond a reasonable doubt. *See generally United States v. Ayala*, 887 F.2d 62, 67 (5th Cir.1989). We must therefore sustain the jury's verdict.

The evidence presented at trial showed the following: Agents Urbina and Compton discovered the defendants in a storage shed that contained only a Chrysler Dart automobile and a U–Haul packing box. The door of the shed was partially closed, lifted about five feet off the ground. While Valdiosera–Godinez was standing next to the trunk on the left side of the car, the other two defendants, who had tools in their hands, were leaning into the back seat of the car through the open rear doors. The horizontal portion of the Chrysler's back seat had been flipped forward and

was resting against the front bucket seats, exposing the underside of the seat. The foam of this underside had been hollowed out in rectangular shapes. Of the two bolts that secure the vertical portion of the back seat, one had been removed and the other was halfway out. When Agent Urbina removed the second bolt, he discovered 19 rectangular bundles of 91% pure cocaine taped to the back of the vertical portion.

The packing box, sitting in the corner of the shed near the right front of the car, appears from the photographs to have been approximately 30 inches on a side. Significantly, the box was unsealed and completely open; exposed to view were nine more bundles of 91% pure cocaine. Parked just outside and partially blocking the shed was a Chevrolet Celebrity automobile. The foam underside of the horizontal portion of the Chevrolet's back seat had been hollowed out in a manner similar to the Chrysler's back seat. This was the situation as it existed when Agent Urbina came on the scene, which caused quite a stir. He testified: "I looked in [the shed] and identified myself as a customs agent, and [the defendants'] mouths fell wide open. Their eyes got real big and they became very nervous."

■ We consider first the possession count. A rational trier of fact could conclude that the defendants each constructively possessed the cocaine. Constructive possession is "the knowing exercise of, or the knowing power or right to exercise, dominion and control over the proscribed substance." *Gardea Carrasco*, 830 F.2d at 45 (quoting *United States v. Vergara*, 687 F.2d 57, 61–62 (5th Cir.1982)). A rational jury could infer that persons found in a small, enclosed space in the presence of a large, open box have the knowing power to walk several steps and gather the contents of the box into their arms. Valdiosera–Godinez asserts that his position in the storage unit "precluded any line of vision" to the U–Haul box. Even so, a person need not have continuous sight of an object to possess it. The only possible relevance of this fact is to suggest that Valdiosera–Godinez had, only moments before the customs agents arrived, innocently walked up and engaged strangers in conversation. This is a possibility, but not a reasonable possibility.

First, the position of the shed's door did not allow contact with the other two defendants without a deliberate entry. It is highly unlikely that persons involved in cocaine smuggling would allow a stranger to enter the domain of their operations to strike up a casual conversation. Second, had Valdiosera–Godinez truly been unaware of the existence of the cocaine and nature of the activities inside the storage unit, he would not have shown surprise or nervousness when Agent Urbina made himself known. His reactions imply the discovery of a criminal enterprise, not the mere interruption of a mundane discussion of auto repair. As to Valdiosera–Godinez's intent to distribute the cocaine, it is easily inferred from the drug's quantity (66½ pounds), purity (91%), and value ($500,000). *See generally United States v. Prieto–Tejas*, 779 F.2d 1098, 1101 (5th Cir.1986).

■ The conspiracy count is subject to the same analysis. The inference of an agreement to possess and distribute cocaine is overwhelming. How else does one synthesize 66½ pounds of cocaine, one car presently concealing the drug, one car prepared to conceal it, and a transfer operation in progress? Had Valdiosera–Godinez not been privy to this agreement and part of it, the other two men certainly would not have allowed him to stick around. It is irrelevant that he was not holding tools when Agent Urbina arrived. His participation in the conspiracy need have consisted of no more than handing others tools, watching for the cops, or protecting the drugs from would-be thieves. The conspiracy cases cited by Valdiosera–Godinez are distinguishable. They essentially involved defendants with mere presence at suspicious places or mere association with established conspirators. In this case, Valdiosera–Godinez's presence and association are coupled with a total absence of rational, non-inculpatory explanations of the facts. The evidence adduced at trial was sufficient to convict the defendant of the offenses charged.

## B. Prosecutor's Closing Arguments

■ Valdiosera–Godinez next argues that the prosecutor made two improper statements to the jury in his closing arguments. First, he alleges that the government "improperly bolstered its case by advising the jury [that] at the time of the arrest, [Valdiosera–Godinez] had been giving directions and orders to Pescador and Garcia–Gil while they were working inside the vehicle in the storage shed." Because the government had adduced no evidence in support of this point, the statement was thus illegitimate and prejudicial. We conclude otherwise.

The challenged statement was as follows:

A person although not in actual possession knowingly has both the power and attention [sic] at a given time to exercise dominion and control over a thing either directly or through other people. Well, these two people with the wrenches were working on [the vehicle], ladies and gentlemen, at the direction of the third person, Mr. Valdiosera. That's the inference to be drawn.... He was advising them and telling them what to do.

Valdiosera–Godinez did not object to the statement. Accordingly, he must show that it amounted to "plain error," error that must be "obvious, substantial, and so basic and prejudicial that the resulting trial lacks the fundamental elements of justice." *See United States v. Davis*, 831 F.2d 63, 66 (5th Cir.1987) (quoting *United States v. Birdsell*, 775 F.2d 645, 653 (5th Cir.1985), *cert. denied*, 476 U.S. 1119, 106 S.Ct. 1979, 90 L.Ed.2d 662 (1986)).

"Clearly," we have held, "an attorney may state to the jury the inferences and conclusions he wishes them to draw from the evidence." So long as he "suggest[s] only those conclusions and inferences that are based on the evidence," he does nothing improper. *Id.* The facts *in evidence* showed that Pescador and Garcia–Gil were working on a vehicle in and around which large amounts of cocaine were found and that Valdiosera–Godinez was standing next to the vehicle in a tightly-confined space. With or without the prosecutor's help, the jury could reasonably have inferred that Valdiosera–Godinez was directing the other two men. The prosecutor did not assert that Valdiosera–Godinez was *in fact* directing them. He said only: "That's the *inference* to be made" (emphasis added). If this comment is error at all, it is hardly plain error prejudicial enough to require reversal.

■ Second, Valdiosera–Godinez alleges that the government improperly commented on the exercise of his right not to testify at trial, in violation of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The challenged comment, to which Valdiosera–Godinez did not object, was part of the prosecutor's rebuttal:

I wish that there was an instrument devised so I could walk up to [the defendants] and just focus this little kind of x-ray machine into their head[s] and say, are you in this conspiracy, and look inside their head[s] with this little machine and find an answer there. It's not the way it really works, because there is no such kind of machine as that. What you find out and how you judge a conspiracy is by concerted action, the concert of action in this particular case.

Because this statement did not obviously refer to Valdiosera–Godinez's exercise of his right not to testify, we apply the rule that "[a] prosecutor's argument will be deemed a reference to defendant's failure to testify if (1) such comment is the prosecutor's manifest intent or (2) it is of such a character 'that the jury would naturally and necessarily' interpret the comment as such." *United States v. Soudan*, 812 F.2d 920, 930 (5th Cir.1986) (per curiam), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). Manifestly, the statement was intended to rebut the rather common argument of defense counsel in conspiracy cases that the government's failure to offer eyewitness testimony or other direct evidence of a formal agreement between the co-conspirators is fatal to its case. Furthermore, no reasonable juror would even remotely connect this comment to any defendant's failure to testify. The

statement was not plain error. We reject the challenges to the closing arguments.

### C. Jury Instructions on Conspiracy

■ Finally, Valdiosera–Godinez complains that the trial court gave "contradictory" and "confusing" instructions to the jury on the meaning of conspiracy, which relieved the government of its burden of proof. The court's definition of conspiracy began: "A conspiracy is a combination or agreement of two or more persons ... to accomplish some unlawful purpose." Four sentences later, the court explained: "In order to establish a conspiracy offense it is not necessary for the government to prove that ... those who were members had entered into any formal type of agreement." These instructions do not contradict one another. A reasonable juror would interpret them to mean: conspiracy requires an agreement, but not necessarily a *formal* agreement. Indeed, our court has used very similar language to define conspiracy: "The essence of a conspiracy is 'an agreement to violate the narcotics laws.' The government need not prove the existence of a formal agreement to establish a conspiracy...." *United States v. Williams–Hendricks*, 805 F.2d 496, 502 (5th Cir.1986) (quoting *United States v. Davis*, 666 F.2d 195, 201 (5th Cir. Unit B 1982)).

As further evidence of "confusion," Valdiosera–Godinez points to a note from the jury that asked the court to "Please define conspiracy." Citing *United States v. Cowan*, 819 F.2d 89 (5th Cir.1987), in which the court reversed a conviction because the trial judge impermissibly influ-

enced the jury to return a verdict, Valdiosera–Godinez speculates that the district court conducted ex parte communication with the jury. It is somewhat troubling that the record contains no indication of what, if any, response the court made to the jury's note. In the absence of any colorable suggestion of ex parte contact, however, we assume that the jury simply received a written copy of the charge. Because the charge accurately stated the law of conspiracy, the jury's verdict against Valdiosera–Godinez was not infirm.

## II.

## DEFENDANT GARCIA–GIL

### A. Motion to Suppress

■ Garcia–Gil first argues that the district court erred in denying his motion to suppress the results of the storage unit search. He claims that the customs agents "seized" him for Fourth Amendment purposes when they first confronted him and that this seizure was not justified by reasonable suspicion, much less probable cause. Because he gave his consent to search the unit only after an illegal investigative stop, the consent was tainted and therefore invalid. The district court found that "[t]he initial contact between Agent Urbina and the three Defendants was merely the sort of consensual encounter that does not implicate Fourth Amendment rights." That is, Garcia–Gil was not "seized" until sometime after he had consented to the search of the storage unit. We affirm the district court's rulings.[1]

---

1. Our court has not yet explicitly specified the standard of review applicable to the seizure question. *United States v. Simmons*, 918 F.2d 476, 479–81 (5th Cir.1990), appears to support the clearly erroneous standard. We now hold that a district court's determination that a seizure has or has not occurred is a finding of fact subject to reversal only for clear error.

We note that other courts of appeals are divided on the proper standard. Four of them will uphold a district court's determination unless it is clearly erroneous. *See United States v. Gordon*, 895 F.2d 932, 937 (4th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990); *United States v. Dunigan*, 884 F.2d 1010,

1014 (7th Cir.1989); *United States v. Archer*, 840 F.2d 567, 571 (8th Cir.), *cert. denied*, 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 354 (1988); *United States v. Collis*, 699 F.2d 832, 835 (6th Cir.), *cert. denied*, 462 U.S. 1119, 103 S.Ct. 3088, 77 L.Ed.2d 1349 (1983). Two will review the determination de novo. *See United States v. Montilla*, 928 F.2d 583, 588 (2d Cir.1991); *United States v. Maragh*, 894 F.2d 415, 417 (D.C.Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990). One has split on the proper standard. *Compare Martinez v. Nygaard*, 831 F.2d 822, 826 (9th Cir.1987) (de novo review) *with United States v. Erwin*, 803 F.2d 1505, 1508 (9th Cir.1986) (clearly erroneous review).

■ According to the Supreme Court, "the police can be said to have seized an individual 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)). The test has an "objective standard—looking to the reasonable man's interpretation of the conduct in question." *Id.* at 574, 108 S.Ct. at 1980. In *Chesternut*, the Court decided that a suspect was not seized when he assertedly was "chased" by a squad car. It was important that "[t]he record does not reflect that the police activated a siren or flashers; or that they commanded respondent to halt, or that they operated the car in an aggressive manner to block respondent's course." *Id.* at 575, 108 S.Ct. at 1980. Moreover, the fact that the officers' conduct "could be somewhat intimidating" does not mean a seizure has occurred. *Id.*

In Garcia–Gil's case, Agents Urbina and Compton showed their badges and announced that they were federal officers, but displayed no weapons. They parked far enough away from the storage unit that the automobile inside could have been driven out. When Agent Urbina asked to speak to the defendants, he motioned them outside the unit instead of barging into it. He twice asked Garcia–Gil to drop the pliers he was holding, but did not confiscate them. An officer of the El Paso Police Department was present, but only *after* the defendants had exited the storage unit. Even so, this officer did not join the customs agents in their conversation with the defendants. This record is similar to the record in *Chesternut*. In the context of an

airport stop, *United States v. Berry*, 670 F.2d 583, 597 (5th Cir. Unit B 1982) (en banc), placed great weight on such factors as "blocking an individual's path or otherwise intercepting him to prevent his progress in any way," "retaining an individual's ticket for more than a minimal amount of time," and making statements "that individuals are suspected of smuggling drugs." In Garcia–Gil's case, the agents did nothing analogous.[2]

We conclude that the district court was not clearly erroneous in finding that Garcia–Gil was not seized in his initial encounter with Agents Urbina and Compton. Because the officers' conduct did not implicate the Fourth Amendment, it need not have been justified by reasonable suspicion. Thus, Garcia–Gil's consent to the search of the storage unit was not tainted or invalid. The court correctly denied the motion to suppress.

### B. *Sufficiency of the Evidence*

■ Garcia–Gil's statement of the issues includes "whether the evidence was sufficient to establish the appellant's guilt beyond a reasonable doubt as to [the offenses charged]." Yet his brief does not thereafter discuss the sufficiency issues at all, not even in the summary section. Garcia–Gil forfeits this point of error under the rule that "any issues not raised or argued in the appellant's brief are considered waived and will not be entertained on appeal." *United Paperworkers Int'l Union v. Champion Int'l Corp.*, 908 F.2d 1252, 1255 (5th Cir.1990).

### C. *Sentencing Guideline Increase*

■ The presentence report found that "Garcia–Gil attempted to escape from the

---

**2.** We recognize that law enforcement officers may seize a person by means of a "show of authority" without exerting any physical force. *See California v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 1550, 113 L.Ed.2d 690 (1991) (citing *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 1, 20 L.Ed.2d 889 (1968)). Superficially, when Agents Urbina and Compton displayed their badges and identified themselves as federal officers, they "showed" their "authority." As a legal term of art, however, "show of authority"

has the meaning given it by *Chesternut:* there is a show of authority by an officer if, but only if, a reasonable person believes he is not free to leave. In *Hodari*, the Supreme Court considered whether, "with respect to a show of authority ..., a seizure occurs even though the subject does not yield," and held that it does not. 111 S.Ct. at 1547. *Hodari* assumed there was a show of authority, whereas in this case, we have concluded no such "show of authority" was made.

Law Enforcement Center in Pecos, Texas on July 11, 1989 while awaiting [trial] for the instant offense." It recommended that Garcia–Gil's offense level be increased by two levels pursuant to § 3C1.1 of the United States Sentencing Guidelines, because he had "attempted to impede the administration of justice during the prosecution of the instant offense." The district court accepted this recommendation. On appeal, Garcia–Gil challenges this increase, arguing only that "[a]n escape attempt based on the paltry facts known below can hardly be said to come under the aegis of § 3C1.1." Garcia–Gil has put forward nothing to convince us that the district court was clearly erroneous in finding that he attempted to escape from jail. Furthermore, we conclude that attempted or actual escapes do come under the aegis of § 3C1.1.

At the time of Garcia–Gil's offenses, § 3C1.1 covered defendants who "willfully impeded or obstructed, or attempted to impede or obstruct, the administration of justice during the investigation or prosecution" of their offenses. Does this definition include attempted escape pending trial? For offenses committed after November 1, 1990, the answer is yes. Application Note 3(e) provides that § 3C1.1 applies to "attempting to escape from custody before trial or sentencing." Prior to amendment, the commentary did not list attempted escape as an example of covered conduct, but it specifically noted that the examples listed were "not exclusive." Application Note 1 (replaced 1990). This non-exclusivity contemplates that the courts will scrutinize conduct for inclusion within § 3C1.1 as situations arise. Having considered the situation in this case, we conclude that an escape or an attempted escape may constitute the willful obstruction of justice for sentencing offenses committed before November 1, 1990. That the Sentencing Commission now explicitly agrees with this conclusion provides more, not less, support for our holding.

If the administration of justice includes the ability of the government to produce for scheduled judicial proceedings those persons lawfully in its custody, then the administration of justice is practically ob-

structed or impeded when such persons escape from custody, presumably never to appear in court. It follows that an attempt to escape is an attempt to obstruct or impede. Other circuits have reached similar conclusions. *See United States v. Teta,* 918 F.2d 1329, 1334–35 (7th Cir.1990) ("defendant's willful failure to appear"); *United States v. Perry,* 908 F.2d 56, 59 (6th Cir.) (defendant who "jumped bond before sentencing"), *cert. denied,* —— U.S. ——, 111 S.Ct. 565, 112 L.Ed.2d 571 (1990); *United States v. Avila,* 905 F.2d 295, 297 (9th Cir.1990) (defendant who "absconded from supervised [pretrial] release and remained a fugitive for five months"). If failing to appear, jumping bond, and absconding from pretrial release are obstructions of justice, so is escaping or attempting to escape from actual custody. The district court correctly applied § 3C1.1 and increased Garcia–Gil's sentence.

Finding no errors in the proceedings below, we sustain both the convictions and the sentences of defendants Rugerio Valdiosera–Godinez and Alejandro Garcia–Gil.

AFFIRMED.