United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 30, 2003**

**Charles R. Fulbruge III**
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

_____

No. 02-40677

UNITED STATES OF AMERICA,

                              Plaintiff-Appellant,

        V.

BRYAN CHADWICK MASK,

                              Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Texas

_____

Before BENAVIDES, STEWART, and CLEMENT, Circuit Judges.

BENAVIDES, Circuit Judge:

The United States appeals an order granting the defendant's

motion to suppress on the grounds that the evidence at issue was

the fruit of an illegal seizure of the defendant's person in

violation of the Fourth Amendment.  Concluding that the district

court erred in finding that the defendant had been illegally

seized, we reverse and remand.

I.  Background

-1-

On the morning of August 2, 2001, Janie Marsh received a phone call at work from one of her neighbors informing her that some vehicles and trailers were backed up to her house and "something was not right." Ms. Marsh called the Gladewater, Texas Police Department and asked them to investigate a possible burglary at her house. Officer Vance Callahan ("Callahan") was dispatched to check on the property, located on a quiet dead-end residential street. Upon his arrival, he saw a sport utility vehicle with an attached trailer backed up to a storage building adjacent to Ms. Marsh's residence. Callahan parked his patrol car in the driveway and approached Christopher Tubbs ("Tubbs"), who was standing next to the SUV. Callahan asked Tubbs for his driver's license and radioed the number to the dispatcher to verify Tubbs's identity and to check for any outstanding warrants or criminal history. Tubbs explained to Callahan that he was Ms. Marsh's former boyfriend, had previously lived with her at the residence, and was in the process of removing his property from the storage building, which belonged to him as well. Callahan spoke with Ms. Marsh, who eventually agreed that Tubbs could retrieve his property.

While Callahan waited for the license check to be completed, Gladewater Animal Control Officer Les Dolbow ("Dolbow") arrived to provide backup, and Bryan Chadwick Mask ("Mask") drove up and parked his sport utility vehicle in front of the house. Dolbow approached Mask, asked for his identification, and asked why he

-2-

was there. Mask responded that he was there to help Tubbs move, which Tubbs confirmed. Mask then gave his driver's license to Dolbow, who gave it to Callahan. While Callahan ran the license checks, Mask sat down on a landscape timber next to the driveway and chatted with Dolbow. Mask asked Dolbow twice for permission to go into Tubbs's vehicle, first to retrieve a cigarette, and then to get some water. Mask went into the vehicle a total of three, or possibly four, times. Dolbow, who at the time had no reason to suspect that Mask was involved in any illegal activities, observed Mask reach behind and in front of the driver's seat towards the console.

The driver's license checks cleared, and Callahan returned the licenses to Mask and Tubbs. Concluding that no burglary was in progress, Callahan informed Mask and Tubbs that they were free to leave. At this point, any reasonable suspicion the officers had had to detain the men had been extinguished. Although free to leave, Mask and Tubbs remained; so did the officers.

Shortly thereafter, Gladewater Police Sergeant Bill Clampitt ("Clampitt") arrived at the scene. Clampitt had received a call from Sergeant Monty Gage with the Gregg County Organized Drug Enforcement Unit, who had earlier received intelligence that Tubbs, but not Mask, was involved in selling narcotics. The district court found that Gage had asked Clampitt to "detain these guys" and gather information on Tubbs. Upon Clampitt's arrival at Ms. Marsh's residence, Callahan joined Clampitt inside

-3-

of his unmarked vehicle and briefed him on the situation. Callahan then asked the dispatcher to repeat the information received from the license checks. It is uncertain what precise instructions Clampitt gave Callahan, or whether Mask overheard Callahan requesting the dispatcher to repeat the license reports.[1] The district court did not make any findings in this regard, and the record is ambiguous on the subject.

After receiving the reports from the license checks once again, Callahan and Clampitt[2] approached Tubbs, who was standing in front of the storage building. There, Clampitt, without entering the building, observed in plain view an illegal sawed off shotgun inside of the building. Clampitt asked Tubbs whose gun it was. Tubbs responded that an "old boy" had given him the gun, but Clampitt could have it because he did not want it. Clampitt took the gun and handed it to Callahan, who secured it in the trunk of his patrol car. Callahan then asked Tubbs to sign a written consent to search form, and Tubbs agreed.

Approximately two to five minutes after the gun was discovered, Officer Gage arrived at the scene and suggested that

---

[1]Mask did not testify at the suppression hearing. There is therefore no testimony from him that he overheard Callahan's request or the repeated report. Further, no testimony was developed to suggest that the request was made loudly or under circumstances where Mask was likely to hear it.

[2]At some point in time, Officer Guthrie, Callahan's partner, arrived on the scene. He soon left, however, at Clampitt's instruction.

-4-

they arrest Tubbs for possession of a prohibited weapon. Callahan did so, and a search of Tubbs's person incident to that arrest revealed a narcotics pipe. Tubbs was placed in the patrol car, and an inventory search of his vehicle resulted in the discovery of over $5,000 in cash and 122 grams of methamphetamine.

Mask continued to sit on the landscape timber next to the driveway as Tubbs's vehicle was searched. Dolbow, from a position in front of Tubbs's vehicle, kept his eye on Mask. Upon learning that Mask had been inside Tubbs's vehicle, Gage asked Dolbow if Mask had been patted down for officer safety. Dolbow responded in the negative, so Gage asked Mask if he would consent to be patted down for weapons. Mask agreed. In the course of the pat-down, Gage felt an object that he recognized to be a marijuana pipe. Mask was arrested for possession of marijuana, and during a subsequent impoundment and inventory of his vehicle, the officers found methamphetamine, marijuana, a pistol, ammunition, and other items consistent with drug trafficking.

Mask was indicted and charged with one count each of conspiracy to possess with intent to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. § 846, possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and using, carrying, and possessing a firearm during and in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Mask

-5-

filed a motion to suppress.  The district court heard the motion

on March 15, 2002, and issued a Memorandum Opinion and Order

granting it on March 25, 2002.  The court noted that Mask was

free to leave at the point when the driver's license check first

came back clear and Callahan told Tubbs and Mask that they were

free to go.  The court concluded, however, that Mask's continued

presence ceased to be voluntary upon the arrival of Sergeant

Clampitt, or in the alternative, when Clampitt found Tubbs's

shotgun.  Because there was no reasonable suspicion at either

point to hold Mask, the court determined that Mask had been

illegally seized, and the evidence of drug trafficking found

during the course of the pat-down and subsequent inventory search

of Mask's vehicle were fruit of that illegality.[3]  The

Government's Motion for Reconsideration was summarily denied on

April 19, 2002.

## II.  Discussion

*A.   Standard of Review*

A district court's factual findings are reviewed for clear

error on appeal, while its legal conclusions, including its

---

[3]The district court also found that in the absence of the
illegal seizure, the evidence obtained from Mask's person and
vehicle was otherwise admissible.  Upon the discovery of the cash
and drugs in Tubbs's vehicle, the court concluded that the
officers had reasonable suspicion to detain and conduct a pat-
down search of Mask.  The subsequent impoundment and inventory
search of Mask's vehicle were therefore deemed reasonable
following his arrest.  These findings are supported by the record
and were not appealed.

ultimate conclusion as to the constitutionality of a law enforcement action, are reviewed de novo.  *United States v. Chavez,* 281 F.3d 479, 483 (5th Cir. 2002).  The parties dispute where, along this simple dichotomy, seizure determinations lie.

The Government contends that this Circuit has split on the standard it applies to seizure determinations, and the Supreme Court's decision in *Ornelas v. United States,* 517 U.S. 690 (1996) requires us to review such questions de novo.  Mask responds that our precedents have consistently reviewed seizure determinations for clear error,[4] and *Ornelas* does not compel us to disregard our established precedent.  We agree with the appellee.

The rules of intra-circuit stare decisis require us to abide by a prior panel decision until the decision is overruled, expressly or implicitly, by the Supreme Court or by the Fifth Circuit sitting en banc.  *Central Pines Land Co. v. United States,* 274 F.3d 881, 893-94 (5th Cir. 2001); *United States v. Garcia Abrego,* 141 F.3d 142, 151 n. 1 (5th Cir. 1998).  Despite the Government's assertions to the contrary, our Circuit is not split on the proper standard by which seizure determinations are to be reviewed.  In *United States v. Valdiosera-Godinez*, we

---

[4]The Supreme Court noted in *Ornelas* that the phrase "abuse of discretion" is preferable to "clear error" when denoting the deferential standard applied to determinations of reasonable suspicion or probable cause.  517 U.S. at 695 n. 3.  The phrase "clear error," however, pervades our Circuit's case law, and for the sake of consistency, we will continue to use it in this opinion.

definitively established clear error review for such findings. 932 F.2d 1093, 1098 n. 1 (5th Cir. 1991) ("We now hold that a district court's determination that a seizure has or has not occurred is a finding of fact subject to reversal only for clear error.").  Subsequent panels have specifically applied this standard,[5] while others, in reciting the fact/law dichotomy have not obviated our clear error precedent.[6]

Nor did the Supreme Court overrule *Valdiosera-Godinez,* either implicitly or explicitly, in *Ornelas.*  517 U.S. 690. *Ornelas* held that a determination as to whether an acknowledged

---

[5] *See United States v. Butler,* 988 F.2d 537, 541 (5th Cir. 1993)(quoting *Valdiosera-Godinez* for the proposition that seizure determinations are reviewed for clear error); *United States v. Encarnacion-Galvez,* 964 F.2d 402, 410 (5th Cir. 1992)(same); *United States v. Holloway,* 962 F.2d 451, 454 (5th Cir. 1992) (same); *United States v. Silva,* 957 F.2d 157, 158 (5th Cir. 1992)(same).

[6] *See United States v. Chavez,* 281 F.3d 479, 483 (5th Cir. 2002)(reciting the standard recitation that factual findings are reviewed for clear error and "ultimate" legal conclusions regarding the constitutionality of law enforcement actions are reviewed de novo, without classifying seizure determinations as one or the other); *United States v. Carreon-Palacio,* 267 F.3d 381, 387 (5th Cir. 2001)(same); *United States v. Cooper,* 43 F.3d 140, 145 (5th Cir. 1995)(same); *United States v. Roch,* 5 F.3d 894, 897 (5th Cir. 1993)(same); *United States v. Diaz,* 977 F.2d 163, 164 (5th Cir. 1992)(same).

In a footnote, the panel in *United States v. Boone* observed that the two different approaches are evidence of an intra-circuit split.  67 F.3d 76, 77 n. 1 (5th Cir. 1995).  However, the general statement that "ultimate conclusions" on Fourth Amendment issues are subject to de novo review is entirely consistent with *Valdiosera-Godinez*, which held that a seizure determination is a finding of fact.  932 F.2d at 1098 n. 1.

-8-

seizure comported with the requirements of the Fourth Amendment was entitled to de novo review.  It did not address the standard by which a determination as to whether a seizure actually occurred in the first place, thereby triggering Fourth Amendment protections, is to be reviewed.  We are unaware of any Supreme Court decision that establishes a rule of law inconsistent with our Circuit precedent.  *See Causeway Med. Suite v. Ieyoub,* 109 F.3d 1096, 1103 (5th Cir. 1997)("for a panel of this court to overrule a prior decision, we have required a Supreme Court decision that...establishes a rule of law inconsistent with our own"), *overruled by Okpalobi v. Foster,* 244 F.3d 405 (5th Cir. 2001)(en banc)(overruling *Ieyoub* on other grounds).  As applicable as the rationales for the *Ornelas* decision may or may not be to the seizure determination, this panel is not at liberty to take a fresh assessment of the question.  *See Central Pines Land Co.,* 274 F.3d at 893-94; *United States v. Kirk,* 528 F.2d 1057, 1063 (5th Cir. 1976).  Therefore, we are obligated to follow *Valdiosera-Godinez* and review seizure determinations as we do findings of fact.[7]

---

[7]The Fourth, and nominally Seventh Circuits, share our position.  *See United States v. Gray,* 883 F.2d 320 (4th Cir. 1989)(holding that seizure determinations are questions of fact subject to clearly erroneous review on appeal); *United States v. Teslim,* 869 F.2d 316 (7th Cir. 1989)(same); *United States v. Sholola,* 124 F.3d 803, 811 (7th Cir. 1997)(calling into doubt the appropriateness of review for "clear error").  The Second, Sixth, Eighth, and D.C. Circuits have reached the opposite conclusion. *United States v. Maragh,* 894 F.2d 415, 417 (D.C. Cir.

As with all factual determinations, a district court's seizure determination is not entitled to deference if it is influenced by an incorrect view of the law. *United States v. Blount,* 98 F.3d 1489, 1495 & n. 16 (5th Cir. 1996)(holding that because district court's search determination was influenced by incorrect view of the law, factual findings on the issue were due no deference), *rev'd en banc*, 123 F.3d 831 (5th Cir. 1997)(reversing *Blount* on other grounds); *United States v. Holloway,* 962 F.2d 451, 454 (5th Cir. 1992).  Because we conclude that the district court's determination that Mask was illegally seized was influenced by an incorrect view of the applicable legal test, its conclusion in this regard is not due any deference, and will therefore be reviewed de novo. *See* discussion *infra* Part II.B.1.

Finally, we view the evidence in the light most favorable to the party prevailing below, appellee Mask. *United States v. Boone,* 67 F.3d 76, 77 (5th Cir. 1995).  This is particularly necessary when, as in this case, the trier of fact was able to make credibility determinations based upon live testimony produced during the course of a hearing. *Id.*

---

1990)(holding that seizure determinations are reviewed de novo); *United States v. Montilla,* 928 F.2d 583, 588 (2d Cir. 1991)(same); *United States v. McKines,* 933 F.2d 1412, 1424-25 (8th Cir. 1991)(en banc)(7-3 decision)(same); *United States v. Buchanon,* 72 F.3d 1217, 1222 (6th Cir. 1995)(same).

*B. Was There An Illegal Seizure?*

1.

It is undisputed that from the point when Callahan took Mask's driver's license, until he returned it three to five minutes later and told Mask that he was free to leave, Mask had been legally detained for purposes of the Fourth Amendment. The question on appeal is whether the district court correctly determined that although Mask was free to go after his license had been returned to him, he was once again seized, this time without reasonable suspicion, upon Officer Clampitt's arrival, or in the alternative, when Officer Clampitt discovered the illegal shotgun in the storage building. The Government does not dispute the district court's determination that the officers lacked reasonable suspicion for the second detention. Rather, the Government contends that Mask's continued presence at Ms. Marsh's residence was voluntary, and did not ripen into a second seizure that triggered Fourth Amendment protections until Mask was patted down by Sergeant Gage (at which point, reasonable suspicion was again indisputably present).

The law regarding the seizure of persons is well developed.[8]

---

[8]*See Terry v. Ohio,* 392 U.S. 1 (1968); *United States v. Mendenhall,* 446 U.S. 544 (1980); *Florida v. Royer,* 460 U.S. 491 (1983); *I.N.S. v. Delgado,* 466 U.S. 210 (1984); *Michigan v. Chesternut,* 486 U.S. 567 (1988); *California v. Hodari D.,* 499 U.S. 621 (1991); *Florida v. Bostick,* 501 U.S. 429 (1991); *United States v. Drayton,* 536 U.S. 194 (2002).

Not all encounters between law enforcement officers and citizens are seizures for purposes of the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 19 (1968). A voluntary encounter between an officer and a citizen may ripen into a seizure, triggering the Fourth Amendment and requiring officers to be able to articulate reasonable suspicion or probable cause, "only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of [the] citizen." *Id.* This principle has since been commuted into a test first proposed by Justice Stewart in *United States v. Mendenhall,* and eventually adopted by the full Court in *INS v. Delgado. Mendenhall,* 446 U.S. 544, 554 (1980); *Delgado,* 466 U.S. 210, 215 (1984). The test provides that an individual has been seized for Fourth Amendment purposes "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id. Accord Michigan v. Chesternut,* 486 U.S. 567, 573 (1988); *California v. Hodari D.,* 499 U.S. 621, 628 (1991); *Florida v. Bostick,* 501 U.S. 429, 434 (1991); *United States v. Drayton,* 536 U.S. 194, ___, 122 S.Ct. 2105, 2111 (2002). This "reasonable person" standard is objective, and is concerned not with the citizen's subjective perception or the officers' subjective intent, but only with what the officers' words and actions would have conveyed to a reasonable and innocent person. *Chesternut,* 486 U.S. at 574, 576 n. 7; *Bostick,*

-12-

501 U.S. at 438.

To the extent that the district court's determination that Mask was seized when Clampitt arrived was affected by the fact that Clampitt came to the scene with the intention to "detain these guys" and investigate Gage's hunch that Tubbs was involved in drug trafficking, it was influenced by an incorrect view of the law. *See* Mem. Opinion and Order of March 26, 2002 at p. 6. The officers' objective conduct, not their subject intentions or private conversations, is relevant to the seizure determination. *Chesternut*, 486 U.S. at 576 n. 7 ("[T]he subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted"). Because the district court did not limit its consideration of the evidence to officer conduct and speech that was visible or audible to Mask, the district court's conclusion that he was seized is due no deference, and we review it de novo. *See Blount,* 98 F.3d at 1495 & n. 16 (when influenced by an incorrect view of the law, factual findings are due no deference); *United States v. Capote-Capote,* 946 F.2d 1100, 1102 (5th Cir. 1991)(same).

2.

Mask contends, and the district court agreed, that the presence of several officers in a quiet residential neighborhood, including a sergeant whose intention was to detain the two men,

and an officer whose sole job was to keep a watchful eye on Mask, created a sufficiently coercive environment such that a reasonable person would not have felt free to leave upon Sergeant Clampitt's arrival. Mask points to the fact that he felt obliged to ask permission to get a cigarette and some water from Tubbs's vehicle for additional support. He also singles out the testimony of Officer Dolbow.

The test for whether a seizure occurred is necessarily imprecise because it seeks to measure the coercive effect of police conduct when viewed as a whole. *Chesternut,* 486 U.S. at 573. Although it eschews focusing on the particular details of that conduct in isolation, Justice Stewart, in *Mendenhall,* thought it helpful to set forth several non-exclusive considerations that may argue in favor of a determination that the defendant had been seized: (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with an officer's request might be compelled. 446 U.S. at 554.

There is nothing particularly coercive about police observation in public. In *United States v. Knotts,* the Supreme Court held that the defendants were not seized when they were subject to continuous visual and electronic surveillance by law enforcement officers. 460 U.S. 276, 281-82 (1983). In *Michigan*

-14-

*v. Chesternut,* the defendant, in downtown Detroit, had started to run when he noticed a marked police cruiser on routine patrol approaching. 486 U.S. at 569. Curious, the officers inside the cruiser decided to follow the defendant, and drove alongside him, without their flashers or siren on. *Id.* at 569,575. The Court held that such conduct, while somewhat intimidating, does not communicate to a reasonable person that he can no longer move about freely, and therefore does not constitute a seizure. *Id.*

Similarly, the fact that one of the police officers kept an eye on Mask as the scene at Ms. Marsh's residence unfolded did not communicate to a reasonable person that Mask could not leave, particularly after he had been specifically told by Callahan that he *could* leave. Nor does the presence of three[9] other officers negate this conclusion. *See INS v. Delgado,* 466 U.S. at 212, 218-29 (finding no seizure when multiple uniformed police officers were stationed at exits to a factory as workers were interrogated by other officers); *United States v. Boone,* 67 F.3d 76, 78 (5th Cir. 1995) (noting but deeming inconsequential the presence of at least four uniformed officers while defendant was being questioned in a bus terminal). None of the officers, through their speech, actions, or position relative to Mask, ever

---

[9]Up to seven officers made an appearance at Ms. Marsh's residence that morning. However, before contraband was found in Tubbs's vehicle, there were no more than four officers present at any particular point in time.

prevented him from walking away or getting into his vehicle and driving off.  There is no evidence that the officers ever brandished their weapons, or spoke to Mask in what we can interpret from the record to be an intimidating manner.  In fact, other than Dolbow, none of the officers paid much attention to Mask at all until contraband was found in Tubbs's vehicle and Gage asked Mask for permission to pat him down.  Up until this point, they were entirely focused on Tubbs.  After all, until contraband was discovered in Tubbs's vehicle, which Mask had been observed going into up to four times, they had no reason to suspect Mask of any wrongdoing.

Appellees contend that if Mask was indeed free to leave, he would not have felt obliged to ask Dolbow for permission to get a cigarette or a bottle of water from Tubbs's vehicle.  However, most people would hesitate before entering and retrieving property from *someone else's vehicle* in the presence of a police officer.  This precept has little bearing on whether a reasonable person would have felt free to leave the scene.  *Cf. United States v. Ward,* 23 F.3d 1303, 1305 (8th Cir. 1994) (noting that fact that officers granted defendant permission to purchase cigarettes actually *supported* position that defendant was free to go about his business and had not been seized).

Mask and the district court also rely in part upon Dolbow's testimony to support their conclusion that Mask was seized upon

-16-

Officer Clampitt's arrival. The following exchange occurred between Dolbow and counsel for Mask on cross-examination:

Q. All right. And so basically, these people were free to leave. And Officer Clampitt gets there, and then all of a sudden, it stopped. And Mr. Mask nor Mr. Tubbs could leave that scene at that time, could they, Mr. Dolbow?

A. At that time, yes, sir.

Q. They couldn't leave?

A. Yes, sir, they could.

Q. Well, if officers asked you for further information, would you feel that you were free to go?

A. *If I wasn't told I was free to go, I'd probably stay, yes, sir.*

The district court's reliance upon Dolbow's italicized testimony as probative of whether a reasonable man would have felt free to leave upon Clampitt's arrival is misplaced. The hypothetical situation created by Mask's counsel that Dolbow responded to never occurred. Mask *was* told that he was free to go shortly before Clampitt arrived, and he *was not* asked for further information after Clampitt arrived. The clear import of Dolbow's testimony is that Mask was still free to go when Clampitt appeared.

It is difficult to see how "[t]hings changed" when Clampitt arrived such that Mask became seized at that point. Little

changed with Clampitt's arrival regarding the coerciveness of the environment with respect to Mask. Dolbow continued to observe Mask from the front of Tubbs's vehicle, as he had since Mask had first appeared. Callahan and Clampitt had a discussion inside of Clampitt's vehicle, and Mask may have overheard Callahan ask for, and the dispatcher repeat, the information from the license report. Mask may have surmised because of this request that the officers had come to suspect him of illegal activity. However, this alone gives us insufficient reason to conclude that Mask was no longer free to leave, despite what Callahan had told him just moments earlier. The defendant in *Chesternut* was probably keenly aware when he was being followed by a police cruiser that the officers inside suspected him of illegal activity. *See* 486 U.S. at 569. Even were we to consider such knowledge, as urged by Mask, the police conduct at issue (conferring among themselves, observing the defendant, and asking the dispatcher to repeat the defendant's license report information possibly within his earshot) lacks the coerciveness characteristic of a seizure. *See id.* Clampitt never approached or spoke to Mask. He and Callahan occupied themselves by dealing with Tubbs's shotgun and the subsequent search of Tubbs's vehicle. In short, the totality of the circumstances indicate that a reasonable person in Mask's position would have felt free to leave the scene after his license had been returned. Clampitt's arrival does not alter

this conclusion.  Mask's decision to remain on the property after Clampitt arrived was a voluntary one.  The district court therefore erred in finding that Mask had been seized when Clampitt appeared at Ms. Marsh's residence.

We also disagree that, in the alternative, Mask was seized when Clampitt discovered the shotgun in Tubbs's storage building.  The court's discussion on this subject centered around the absence of reasonable suspicion to justify a seizure at this point, so we are unable to determine what the court's rationale was for determining that Mask was seized at the particular moment when the shotgun was found.  Because we see no evidence in the record that the officers' behavior *with respect to Mask* changed at all when the shotgun was found, we cannot agree that the environment became sufficiently coercive such that Mask was seized at that point.

### III.  Conclusion

The district court erred in finding that Mask was seized in violation of the Fourth Amendment.  The evidence that was discovered on Mask's person and in his vehicle was thus not tainted by an illegal seizure, and Mask's motion to dismiss should have been denied.  We therefore REVERSE the district court's order and REMAND for further proceedings.