# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
June 29, 2023

Lyle W. Cayce
Clerk

No. 22-50045

United States of America,

*Plaintiff—Appellee*,

*versus*

Jordan Ray Smith,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:21-CR-218-1

_____

Before Higginbotham, Graves, and Douglas, *Circuit Judges*.

Patrick E. Higginbotham, *Circuit Judge*:[*]

Midland Police Officer Jeremy Renforth searched Jordan Ray Smith and found a firearm. Charged as a felon-in-possession, Smith moved to suppress. The district court denied the motion, finding that the conversation leading to the search and the search were consensual, or alternatively supported by reasonable suspicion. We AFFIRM.

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-50045

## I.

## A.

On July 13, 2021, MPD Officer Renforth was "dispatched" to follow up on a "suspicious person-call . . . at the Candlewood Suites motel." The anonymous call had come to the Midland Police Department Communications Center, relaying "a description of the subject[s]"—"a black male with a blue shirt . . . as well as another black male with no description"—and a location "at [the motel's] rear parking lot area." According to Renforth, the caller "was approached by these people and they had offered to sell him drugs or a gun." Renforth was in the area and quickly arrived on scene.

According to Renforth, upon arriving at the motel area, he noticed a Black male with a blue shirt—later identified as Jordan Ray Smith—"look[] over, s[ee] my patrol unit, which it's a marked patrol unit, then start[] walking away." Given that response, Renforth "believe[d] that this [was] going to be the person [he] probably need[ed] to talk to." After circling the area "to make sure that there[] [was] not anybody else . . . that matche[d] those descriptions there," Renforth got out of his car and approached Smith without activating his emergency lights or sirens.[1] Finding Smith was on the phone with his wife, Renforth requested that he hang up the phone so that they could speak, saying "you could talk to her later." Smith put the phone down, but did not disconnect the call.

When Renforth told Smith that the police received a call regarding someone in the area selling drugs and a firearm, Smith stated unequivocally that he was not doing so. Complying with Renforth's request, Smith gave

---

[1] Renforth's body camera footage, which began here, confirms this. The remainder of the factual recitation is gleaned from this footage.

No. 22-50045

Renforth his personal information, including his name, address, and phone number. Renforth then asked whether Smith had any weapons on his person. Smith said "no, sir." Renforth also asked if Smith was carrying drugs or anything illegal. Again, Smith said "no, sir." Renforth sought Smith's consent to search his "person to make sure." Smith granted Renforth permission, saying "Yes sir," but quickly added, "The only thing I do have, because I just picked it up is [my wife's] pistol, I got her pistol, I just went and got it."

Renforth asked if it was on his person. Smith said yes. Renforth said: "Without pointing at it, where is it?" Smith raised his hands, jutted his left hip out, and said it was in his pocket. Smith raised his hands further and offered Renforth the opportunity to retrieve the pistol himself. Instead, Renforth placed Smith in handcuffs, explaining that it was necessary to retrieving the pistol safely. Once Smith was secured, Renforth confirmed which pocket the firearm was in and then retrieved it from his jeans pocket. Renforth escorted Smith to his cruiser and asked for consent to complete his search, which Smith permitted. Indeed, Renforth then said, "I appreciate you being honest and working with me." The subsequent portion of the search found a pocketknife, a "meth pipe," a torch lighter, and a flip phone (not the phone on which Smith was speaking). Following the search, Renforth placed Smith in the back of his vehicle to secure him.

With Smith in the cruiser, Renforth obtained Smith's driver's license information from a database search on his mobile laptop and radioed in to request further investigation of Smith's background. Renforth also requested a check on Smith's pistol, submitting the make, model, and serial number. While waiting on this information, Renforth called the anonymous tipster, asking to describe again what the gun seller was wearing. The tipster stated that the purported seller was wearing a "blue and black shirt I think." Renforth asked the tipster to confirm if the seller was Black—the tipster so

3

No. 22-50045

confirmed—and, then, what the seller's skin tone was—dark, medium, or light. The tipster stated "Medium." The tipster said he was unsure of the seller's height and other clothing because the seller was sitting down. In the conversation, Renforth noted, "I actually have the guy, I'm just trying to see if you can describe him to me, make sure I got the right guy." The tipster then estimated the seller's age to be 35 and described him as skinny with scruffy short hair. Finally, Renforth urged the tipster to disclose his identity, but the tipster refused, fearing police involvement and retaliation.

**B.**

In July 2021, Smith was indicted on a single count of possession of a firearm by a convicted felon. Two months later, the district court heard Smith's motion to suppress the firearm. Renforth was the only witness questioned, and both the Parties and the court questioned him about everything from the dispatch to his arrival on the scene and his training.

Four days after the hearing, the district court issued a 16-page opinion denying the motion. The district court found that both the initial encounter and the pat down search were consensual. The court also held that even absent Smith's consent, "the Government succeeded in carrying its burden of proof by showing, based on the totality of the circumstances, which included a credible tip and [Smith]'s evasive behavior during an encounter in a high crime area, that Officer Renforth had reasonable suspicion to execute a *Terry* stop and pat down on [Smith] after [Smith] initially consented to the search."

Following the suppression hearing, the district court found Smith guilty in a bench trial facilitated by the Parties' stipulation of facts, which "la[id] out some recommendations concerning the denial of the Defendant's motion to suppress as well as what the [P]arties' recommendation [would] be concerning acceptance of responsibility at sentencing." Smith was

4

No. 22-50045

ultimately sentenced to 37 months' imprisonment, the top of the Guidelines range.

Smith timely appealed.

## II.

"When examining a district court's ruling on a motion to suppress, [this Court] review[s] questions of law de novo and factual findings for clear error."[2] The evidence is viewed in the light most favorable to the party that prevailed in the district court.[3] "The district court's ruling on a motion to suppress will be upheld if there is any reasonable view of the evidence to support doing so."[4]

## III.

## A.

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."[5] "Warrantless searches and seizures are *per se* unreasonable unless one of the recognized exceptions applies."[6] "The Government bears the burden of showing that a warrantless search or seizure fits within one of the exceptions."[7]

---

[2] *United States v. Wise*, 877 F.3d 209, 215 (5th Cir. 2017) (quoting *United States v. Hearn*, 563 F.3d 95, 101 (5th Cir. 2009)).

[3] *United States v. Toussaint*, 838 F.3d 503, 507 (5th Cir. 2016).

[4] *United States v. Thomas*, 997 F.3d 603, 609 (5th Cir. 2021) (citing *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc)), *cert. denied* 142 S. Ct. 828 (2022).

[5] U.S. CONST. amend. IV.

[6] *Thomas*, 997 F.3d at 609 (citing *Cotropia v. Chapman*, 978 F.3d 282, 286 (5th Cir. 2020)).

[7] *Id.* (citing *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017)).

No. 22-50045

As we have explained:

There are three recognized types of encounters between law enforcement officers and citizens, including: 1) a consensual encounter during which an individual voluntarily agrees to communicate with the police; 2) a limited investigatory stop based upon less than probable cause; and 3) an arrest which constitutes a seizure under the Fourth Amendment.[8]

As for voluntary or consensual encounters, "[t]he Fourth Amendment permits police officers to approach [individuals] at random to ask questions and to request their consent to searches, provided a reasonable person would understand that he or she is free to refuse."[9]

This [C]ourt considers six factors when evaluating the voluntariness of consent:

(1) the defendant's custodial status;

(2) the presence of coercive police procedures;

(3) the extent and level of the defendant's cooperation with the police;

(4) the defendant's awareness of his right to refuse consent;

(5) the defendant's education and intelligence[;] [and]

---

[8] *United States v. Williams*, 365 F.3d 399, 403–04 (5th Cir. 2004) (citing *United States v. Cooper*, 43 F.3d 140, 145–46 (5th Cir. 1995)).

[9] *United States v. Drayton*, 536 U.S. 194, 197 (2002) (citing generally *Florida v. Bostick*, 501 U.S. 429 (1991)).

6

(6) the defendant's belief that no incriminating evidence will be found.[10]

Consensual encounters "may be initiated by the police without any objective level of suspicion,"[11] and during such encounters, officers "may ask questions of the person, ask for identification, and request permission to search" an individual or one's personal effects.[12]

"A district court's determination that an exchange with a police officer constitutes a consensual encounter, rather than a seizure implicating Fourth Amendment protections, is a factual finding reversible only for clear error."[13] This Court "examines the following non-exclusive factors for determining whether a consensual encounter occurred: '(1) the threatening presence of several police officers; (2) the display of a weapon by an officer; (3) physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with an officer's request was compelled.'"[14]

---

[10] *Cooper*, 43 F.3d at 144 (citing *United States v. Ruigomez*, 702 F.2d 61, 65 (5th Cir. 1983)).

[11] *Id.* at 145.

[12] *Williams*, 365 F.3d at 404 (citing *Drayton*, 536 U.S. at 200–01).

[13] *United States v. Gurrola*, 301 F. App'x 337, 340 (5th Cir. 2008) (unpublished) (per curiam) (citing *United States v. Butler*, 988 F.2d 537, 541 (5th Cir. 1993); and then citing *United States v. Mask*, 330 F.3d 330, 334 (5th Cir. 2003)); *see also United States v. Muniz*, 340 F. App'x 192, 196 (5th Cir. 2009) (unpublished) (per curiam) ("A district court's determination that an exchange with a police officer constitutes a consensual encounter, rather than a seizure implicating Fourth Amendment protections, is a factual finding reversible only for clear error." (citing *Mask*, 330 F.3d at 334)).

[14] *United States v. Guevara*, 448 F. App'x 453, 456 (5th Cir. 2011) (unpublished) (per curiam) (quoting *Mask*, 330 F.3d at 337).

No. 22-50045

Relatedly, we "review fact-findings as to the voluntariness of consent to search for clear error."[15] And "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."[16]

**B.**

Here, the record supports the district court's factual determinations that Renforth's initial discussion with Smith and subsequent search were consensual. We review each separately.

**i.**

First, there is no evidence that Renforth was a "threatening presence." At no point did Renforth "block[]" Smith's "path."[17] To the contrary, Renforth "permitted [Smith] to keep his cell phone" throughout the interaction, even allowing Smith to continue a call to his wife (Smith stated she was on the line).[18] The brevity of the discussion also evidences a voluntary encounter—that he was not "subject to a lengthy interrogation."[19] Moreover, this Court has repeatedly referenced the number of officers engaging in an interaction as relevant in consent analysis, reflecting the obvious fact that more officers can create an air of coercion.[20]

---

[15] *United States v. Glenn*, 931 F.3d 424, 428 (5th Cir. 2019).

[16] *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

[17] *Tyson v. Sabine*, 42 F.4th 508, 516 (5th Cir. 2022) (quoting *United States v. Berry*, 670 F.2d 583, 597 (5th Cir. Unit B 1982)).

[18] *United States v. Wilson*, 306 F. App'x 871, 873 (5th Cir. 2009) (unpublished) (per curiam).

[19] *United States v. Brown*, 567 F. App'x 272, 280 (5th Cir. 2014) (unpublished).

[20] *See Guevara*, 448 F. App'x at 456 ("Furthermore, only two officers talked with him; most of the remaining officers were inventorying the store."); *United States v. Colunga-Perez*, 124 F.3d 193 (5th Cir. 1997) (unpublished) (per curiam) ("Although

8

No. 22-50045

Second, the bodycam footage suggests that at no point did Renforth reach for or "brandish a weapon or make any intimidating movements,"[21] nor does Smith suggest such actions occurred. Similarly, during the initial encounter, Renforth never placed his hands on Smith.

Third, Renforth never told Smith that he was the individual suspected of criminal activity. This Court "ha[s] recognized that statements by an officer indicating that an individual is suspected of illegal activity are persuasive evidence that an objectively reasonable person would not feel free to leave."[22] By contrast, disclosing a generalized suspicion about a crime to an individual "is insufficient to effect a seizure."[23]

Renforth's statements fall into the latter category, beginning the conversation with Smith with an explanation that "we just got some calls from some people about, I guess, some Black male trying to sell people drugs and guns." Smith responded: "Nah, not I," and the two pivoted the conversation to Smith's presence in the area.[24]

---

approximately ten officers were on the property, only two were near the defendant when he consented to the search.").

[21] *Wise*, 877 F.3d at 221 (5th Cir. 2017).

[22] *Sabine*, 42 F.4th at 516 (collecting cases).

[23] *Id.*

[24] *See Berry*, 670 F.2d at 597 ("Statements which intimate that an investigation has focused on a specific individual easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention."); *United States v. Gonzales*, 79 F.3d 413, 420 (5th Cir. 1996) (noting that officers' statement "that the car [the defendant] was driving was suspected of being used to transport drugs . . . may have pushed the encounter, which was initially consensual, to being a *Terry* stop"); *United States v. Zukas*, 843 F.2d 179, 182 (5th Cir. 1988) (holding that "when the police officers . . . informed [the defendant] . . . that *he* was suspected of smuggling drugs" a seizure occurred (emphasis added)); *United States v. Hanson*, 801 F.2d 757, 761 (5th Cir. 1986) ("[W]hen [the officer]

No. 22-50045

Finally, Renforth's "use of language [and] tone of voice" suggest that the search was consensual. Upon review of the bodycam footage, at no point did Renforth raise his voice or yell at Smith. He was instead calm and spoke to Smith respectfully throughout the encounter (both the initial encounter and the frisk), supporting a finding of no coercion or compulsion.[25]

So, then, Smith's contention that the initial interaction was not consensual largely rests on two issues: (1) Renforth's driving "so close" to Smith; and (2) Renforth's telling Smith "[y]ou can talk to [your wife, with whom you are currently on the phone] in a minute." Neither argument persuades.

In *Michigan v. Chesternut*, a defendant started to run upon noticing a police cruiser, which prompted the driver, an officer, to follow the defendant and "dr[i]ve alongside him for a short distance."[26] A unanimous Supreme Court offered relevant signals of intimidation—here absent—including activating flashers or sirens, brandishing firearms, commanding the defendant to halt, or driving the cruiser "in an aggressive manner to block [his] course or otherwise control the direction or speed of his movement," and "[w]hile the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of police presence does not, standing alone, constitute a seizure."[27] If the defendant in *Chesternut* was not seized, neither was Smith.

---

. . . informed [the defendant] that he . . . [was] suspected of carrying drugs, a reasonable person would not have believed that he was free to go.").

[25] *See, e.g.*, *United States v. Abdenbi*, 361 F.3d 1282, 1292 (10th Cir. 2004) (noting that an interaction was consensual where, inter alia, the officer "did not raise his voice").

[26] 486 U.S. 567, 569 (1988).

[27] *Id.* at 575.

Upon initially approaching, the encounter proceeded as follows:

Renforth:    Hey partner.

Smith:        Yes sir.

Renforth:    Do you mind hanging up the phone and talking to me real quick?

Smith:        Huh?

Renforth:    Do you mind hanging up and talking to me real quick?

Smith:        It's my wife.

Renforth:    Ok, [sigh] well, you can talk to her in a minute.

All the while, Smith remained on the phone, having only dropped the phone from his ear while keeping the phone in his hand and the call connected, with Renforth raising his generalized suspicion with Smith. And given Smith's cooperative response to Renforth, it is fair to conclude that if Smith thought "compliance with [Renforth's] request [to hang up] was compelled,"[28] he would have complied. Regardless, this alone cannot overcome the deference due to the district court's decisive review.

**ii.**

This analysis carries into the search, as the initial encounter provides vital context to the search itself. Indeed, the only additional fact to add is the discussion undertaken *just* before the search. Renforth, after speaking with Smith for approximately one minute to obtain Smith's identifying information, asked Smith if he had "any weapons on [him]" and whether Smith had any "drugs or anything illegal." Smith immediately and unequivocally answered no to both questions. Thereafter, Renforth calmly

---

[28] *Guevara*, 448 F. App'x at 456 (quoting *Mask*, 330 F.3d at 337).

asked, "May I search your person to make sure?" Smith answers "Yes Sir," but then immediately reverses course and states that he does have a pistol on him. Without touching Smith, Renforth asks where it is on Smith's body, and Smith lifts his arms and sticks his hip out. Renforth says "Can I have you --" when Smith cuts him off, says "Yes, sir, you can get it" and raises his arms further. In these questions, Renforth is expressly asking for *permission* to proceed with an action pursuant to a search, and in both instances, Smith answers affirmatively and without qualification.

Again, Renforth did not present an overwhelming show of force with multiple officers in tow nor did he use inappropriately demanding language or an intimidating tone of voice, which could suggest compliance is required. He did not brandish his weapon, nor did he take any other escalatory action. Rather, he calmly requested permission to search Smith. In sum, there is more than enough record evidence to affirm the district court's finding of fact that the search was conducted with Smith's consent.[29]

\* \* \* \* \*

AFFIRMED.

---

[29] Upon finding that the district court did not clearly err with respect to its factual finding that Smith consented to the initial discussion as well as the searches, we need not review the district court's alternative holding that Renforth also had reasonable suspicion to search Smith even in the absence of consent.