**UNITED STATES of America,**

v.

**Quinton SMITH, Defendant.**

**Crim. No. 02–10421–NG.**

United States District Court,
D. Massachusetts.

July 19, 2004.

---

278

Thomas E. Kanwit, United States Attorney's Office, Boston, MA, for U.S.

J. Martin Richey, Federal Defender's Office, Boston, MA, for Quinton Smith, Defendant.

### *MEMORANDUM AND ORDER*

GERTNER, District Judge.

The defendant Quinton Smith ("Smith") was arrested by Boston Police officers on September 16, 2002, and charged in a one-count indictment with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Smith moved to suppress the gun [document # 32], claiming that it was seized in violation of his rights under the Fourth Amendment of the United States Constitution. For the reasons set forth below, that motion is **GRANTED**.

I held an evidentiary hearing over three days on defendant's motion to suppress. More significantly, after hearing the testimony, I personally conducted a view of the scene of the incident so as to aid in my application of the relevant legal standards set by the United States Supreme Court. I sat on the wall where Smith sat, saw what he saw, and used that to determine whether a reasonable person in his position would have felt free to leave, or to terminate the encounter with the officers. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct.

2382, 115 L.Ed.2d 389 (1991). Likewise, I stood where the officers stood and was able to evaluate the reasonableness of their belief that Smith was not waiting for a bus. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

I concluded that the officers unlawfully seized Smith without any reasonable suspicion of criminal conduct, and that any evidence found as a result must be suppressed.

## I. *FINDINGS OF FACT*

Based on the evidence submitted at the hearing, and my own observations made at the scene, I make the following findings of fact. My findings with respect to the encounter adopts—almost entirely—the testimony of the officers, as I found them to be credible. Where my findings depart, I note specifically.

On September 16, 2002, at approximately 1:30 p.m., Boston Police officers James Tarantino ("Tarantino") and Daniel Griffin ("Griffin") were patrolling the Dorchester area of Woolson Street and Blue Hill Avenue. According to the officers, this is a high crime area, and both claimed to have made a number of arrests in that area, and known about others.

As the officers traveled in their marked police cruiser down Woolson Street (a one-way street) towards Blue Hill avenue, they observed a black male, Smith, sitting on a low wall. Neither officer recognized Smith, although both patrolled the area regularly and were "familiar with a lot of the locals," according to Griffin.[1] The officers did not stop their cruiser at the first observation of Smith, and instead drove around the block in a loop and came back to where he was sitting. They pulled up and Griffin, who was in the passenger's seat, nearest to Smith, asked Smith if he lived at the house in front of which he was

---

1. In fact, Smith had grown up two blocks away on Deering Road.

sitting.[2] When Smith said he did not, Griffin asked him what he was doing sitting on the wall. Smith said he was waiting for the bus. Smith's answers to these questions, and all others, were both casual and polite.

The officers assumed, correctly, that Smith was referring to the bus that stops on Blue Hill Avenue, on the corner across Woolson Street. According to the officers, Smith's response did not make sense—someone waiting for that bus would not be sitting where Smith was sitting. It is thus that statement—that he was waiting for the bus—which the officers and the government contend[3] created the necessary reasonable and articulable suspicion to justify a *Terry* stop, if such a stop occurred.[4]

### A. The Bus Stop

Although today there is a bus shelter at the bus stop on Blue Hill Avenue by Woolson Street ("the bus stop"), on September 16, 2002, there was only a sign. There was no place to sit at the bus stop. The wall on Woolson Street was the nearest seat to the site where the bus would stop. In addition, there was a drizzling rain that day, and the place on the wall where Smith was sitting was covered at least to some degree by the canopy of a tree.[5] It is true that a number of trees provided cover at the bus stop, but, according to Smith's uncontradicted testimony, between eight to ten people stood there waiting for the bus.

So Smith chose, not surprisingly, to have a seat by himself and watch for the bus's arrival. The bus stop was only 100 feet[6] from where Smith sat, and with eight to ten people waiting, he could feel confident that when he saw the bus approaching he would have time to cross the quiet Woolson Street before all were onboard.[7] Dur-

2. Smith testified at the hearing, and his account differed from the officers' in a number of respects. Most notably, Smith testified that the officers drove quickly around the block and approached where he was sitting at 15–20 miles per hour. They then stopped the cruiser angled towards where he was seated. He testified they immediately exited the car, approached Smith and began questioning him. In Smith's account, therefore, no questions were asked while the officers were inside the cruiser, and Smith was surrounded immediately under even more aggressive circumstances.

Although I found Smith to be a credible witness, I credit the officers' account on this point.

3. The government argues Smith's presence in a high crime area and the fact that neither officer recognized him from the neighborhood also contributed to their suspicion, but the government could not and does not argue that reasonable suspicion would have existed in the absence of Smith's claim that he was waiting for the bus.

4. As is discussed in detail below, the government argues that there was no seizure of Smith at all that implicates Fourth Amendment protections. Alternatively, the government argues that even if the stop were a *Terry* stop—defendant does not argue the stop went beyond *Terry*—the officers had reasonable and articulable suspicion to justify it.

5. The government has pointed out that the police report states that the weather was cloudy, not rainy. Neither officer contradicted Smith on this point, however, and I found his statement on this point completely credible.

6. Defense Investigator Andy Pevehouse testified to having measured that distance using a "Wally Walker"—a wheeled device that is rolled on the ground to measure distance—and double-checked that result using his own pace. His measurement was consistent with what I observed, and was noticeably more accurate than the estimate of 50–75 yards the officers testified to (Tarantino actually said 50–70 meters) or the 100 yards described in the government's initial opposition to defendant's motion to suppress.

7. Pevehouse's estimate of 13–16 seconds to walk from Smith's spot on the wall to the bus stop was again consistent with my observations.

ing the view, I sat where Smith sat and looked up Blue Hill Avenue as Smith did for an approaching bus.[8] I found it completely reasonable that someone would sit there waiting for that bus as Smith did.

I find that from the officers' position, considering what they said they saw and heard as they approached Smith on September 16, 2002, Smith's story was absolutely plausible; and the officers' contrary conclusions, unreasonable.[9]

## B. *The Officers Approach of Smith*

Believing that having determined that Smith's story was suspicious, however, Griffin responded that the bus was a distance away from where he was sitting, and asked Smith why he was not actually at the bus stop. Griffin's tone was increasingly sarcastic and aggressive. Smith responded, again calmly and politely, that he could catch the bus from where he was sitting.

Notwithstanding Smith's response—and its reasonableness, the officers exited the cruiser and approached him in order to fill out a Field Intelligence and Observation Report ("FIO").[10] Tarantino got out of the driver's side and stopped at Smith's right, within arm's reach. Griffin exited the passenger's side and stopped at Smith's left, also within arm's reach. Both officers were armed and in uniform, although their guns were not drawn.

Between the officers, and directly in front of Smith as he faced the street, was a telephone pole. Behind Smith and the 3' wall he sat on, was rough, very uneven terrain, with different levels, and physical obstacles of varying sorts. Behind that was another fence. Having sat where Smith sat and visualized where the parties agree the officers stood, I concluded that Smith was surrounded by the officers. There was no meaningful egress. He had nowhere to go unless the officers moved, or he decided to jump the wall or run across the uneven ground toward a fence.[11]

8. I could easily see down Blue Hill Avenue past the bus stop in the direction from which a bus would have approached. Although buildings on Blue Hill Avenue limited the view to some degree, it was clear Smith could have seen at least a few seconds of a bus's approach prior to it reaching the bus stop.

9. This is not a case of ad hoc decision-making and a judge criticizing, after hours of reflection a decision officers made in a few minutes. The plausibility of Smith's story and the unreasonableness of the officers' suspicions were apparent the moment I arrived at the scene and viewed for myself the distance from the bus stop to the wall.

10. Defendant has argued the officers were determined to fill out an FIO from the moment they spotted Smith. That suggestion is supported by the Incident Report [defendant exhibit #1], which states "[t]he officers stopped their marked mv (motor vehicle) to talk to the suspect and to fill out an FIO." Regardless, it is unimportant when the officers decided to fill out an FIO. An attempt to fill out an FIO is not per se a seizure, and the officers agree they planned to fill out an FIO when they exited the vehicle.

An FIO report, according to the officers' testimony, would have included information such as defendant's name, nickname, type of clothing worn, date of birth, social security number, and home address. Defendant, in his post-hearing memorandum [document #38], suggests the officers violated Rule 323 of the Boston Police Department Rules and Procedures manual, because Rule 323 § 3 directs officers to complete an FIO upon the observation of "known criminals" or persons "suspected of having an unlawful design," since Smith fell into neither category when the officers observed him unless the level of suspicion required is de minimus. While I agree with defense counsel that the FIO procedure is troubling, the only question before this Court is whether the September 16, 2002, encounter violated the Fourth Amendment.

11. I observed that the fence had a very small opening. It was not at all clear to me that a man of Smith's size would have made it through.

Griffin asked Smith for identification, which Smith produced.[12] As Griffin started back to the cruiser to run Smith's name through the mobile data terminal, Smith told the officers that he had an outstanding warrant for a motor vehicle violation. Griffin returned to the cruiser. The data check revealed that Smith was truthful. He had an outstanding arrest warrant for receiving stolen property (a motor vehicle) from the Dorchester District Court.

The officers placed Smith in custody, after a brief struggle. A search uncovered a .25 caliber pistol and four rounds of ammunition, one of which was in the pistol's chamber. The officers also recovered three plastic bags containing a green leafy substance believed to be marijuana, a class D controlled substance.

## II. *CONCLUSIONS OF LAW*

Smith argues the officers "seized" him within the meaning of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) prior to the point at which he admitted to having an outstanding arrest warrant.[13] The government disagrees. It argues there was no seizure before the officers learned of the warrant, and alternatively that the seizure was a *Terry* stop supported by reasonable suspicion.

First, I will evaluate whether Smith was seized prior to the point at which the officers learned of the warrant. Second, I will determine whether the officers had sufficient suspicion that Smith was engaged in criminal conduct to justify a *Terry* stop.

### A. *Seizure*

■ A seizure occurs when, by means of physical force or show of authority, a person's freedom of movement is restrained. *Bostick*, 501 U.S. at 434–36, 111 S.Ct. 2382, quoting *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868. As long as the person questioned by an officer remains free to disregard the questions and walk away, there has been no seizure. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870. Determination of whether an individual has been seized must be made on a case-by-case basis, evaluating whether, under the totality of the circumstances, a reasonable person would have believed he or she was not free to leave or terminate the encounter. *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988).

■ It is true, of course, that every street encounter between a citizen and the police is not a "seizure." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870. The government tries to carve out each individual aspect of the encounter and point out that each part would probably not be enough to constitute a seizure. The U.S. Supreme Court has, in fact, stated that officers with no basis for suspecting a particular individual may still generally questions him; *see e.g. INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), and ask to examine the individual's identification, *see e.g. Royer*, 460 U.S. at 501, 103 S.Ct. 1319, as long as they do not convey the message that he *has* to comply.

■ Questioning or asking for identification may or may not implicate the Fourth Amendment. The issue is what the totality of the circumstances suggests. *See Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870. In my judgment, in view of all the

---

12. Griffin testified that he asked Smith for his name and Smith on his own produced identification out of his pocket. Tarantino, however, corroborated Smith's account that Griffin asked Smith for identification.

13. The parties agree that probable cause existed once Smith admitted to having an outstanding arrest warrant.

circumstances, and my own observations of the scene, a reasonable person in Smith's position would not have felt free to leave or to terminate the encounter. *Id.; Bostick*, 501 U.S. at 436, 111 S.Ct. 2382. I find that a seizure had taken place at least by the time the officers approached Smith, surrounded him, and asked for identification.

In *Mendenhall,* the U.S. Supreme Court gave examples of some circumstances that might indicate a seizure: the threatening presence of officers, the display of a weapon, physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance might be required. *Id.,* citing *Terry,* 392 U.S. at 19, n. 16, 88 S.Ct. 1868; *Dunaway v. New York,* 442 U.S. 200, 207 and n. 6, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); 3 W. LaFave, Search and Seizure 53–55 (1978). Here, three of those four circumstances were present. Although there were only two officers, their presence was threatening because effectively they surrounded Smith and blocked his path to the bus stop. It was additionally threatening because, as discussed below, they approached after he had responded truthfully to the officers' initial questions. Though holstered, both officers' were armed and in uniform. Griffin's tone was increasingly aggressive and sarcastic throughout.

Smith gave polite answers. The officers responded by closing in on him and questioning him in an increasingly aggressive tone. He told them the truth, and they became more forceful rather than less. They moved closer to him rather than further away. The timing of their approach was a signal that the questions were going to continue, whether Smith wanted to leave or not.

The government has compared the officers' positions around Smith to that of two friends who had approached defendant to have a conversation with him. Their guns, uniforms, and the fact that they did not know each other aside, the circumstances under which they approached Smith would have indicated to him that this was neither a friendly nor an optional encounter.

Any doubt about this was removed when Griffin asked Smith for identification, a request that Smith reasonably believed he had no choice but to answer. Putting aside the fact that the officers were blocking his ability to watch for the bus, much less catch the bus, Smith would not have had time to terminate the conversation with the officers, get his identification back, and still catch the bus. Griffin's "request" for identification was a clear statement: forget about the bus, you are not going anywhere.

The facts of this encounter share numerous similarities with the facts of *United States v. Reyes,* 1987 WL 6935 (D.Mass. 1987). In *Reyes,* Judge Woodlock suppressed evidence under the following circumstances: Defendant was approached while standing in a moving taxi line. Two law enforcement agents approached Reyes, one to the left and slightly in front of him and the other to the left and slightly behind him. Although one of the agents was an "imposing figure," both were in street clothes and only one had his weapon visible. One of the agents asked Reyes a number of questions (where he was going, whether the name on his airline ticket was his, etc.), all of which Reyes answered truthfully.

The agent then asked Reyes whether the agent could look in Reyes' bag, and whether Reyes still wished to remain in the taxi line. Reyes did not answer orally, but "confronted by the two officers and their continued questioning, responded to their persistence, positioning, and presence by moving out of the taxi line." *Id.* at *2.

Judge Woodlock found that Reyes had been seized at least by the time Reyes stepped out of the taxi line, an act which Judge Woodlock held "evidence[d] precisely the restriction of movement which the *Mendenhall* conceptualization of seizure is designed to define."[14] *Id.* at *3. As I do here with regard to the acts which made clear Smith would not be getting on any bus that approached, Judge Woodlock found significant that the movement out of the taxi line was "part of a context involving continued questioning ... even after Reyes gave truthful answers to identification questions."[15] *Id.*

As in *Reyes,* the actions of the officers put Smith in a position in which a reasonable person would not have felt free to leave or to terminate the encounter. As such, he was seized within the meaning of the Fourth Amendment, and reasonable suspicion was necessary as justification. I now turn to the government's argument that the officers had such reasonable suspicion.

## B. *Reasonableness*

■ The Fourth Amendment protects only against unreasonable searches and seizures. In *Terry,* a watershed opinion, the U.S. Supreme Court recognized that the Fourth Amendment "does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Indeed, *Terry* recognized that it may be "the essence of good police work to adopt an intermediate response." *Id.* at 145. If the officer had less than probable cause, he was only authorized to temporarily stop and question the suspect, not arrest him, and if the officer feared for his safety, to pat the suspect down or "frisk" him. The intrusion was relatively minor, because the information justifying it was less substantial. Nevertheless, the intrusion had to be based on "articulable suspicion that a person has committed or is about to commit a crime." *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

■ A finding of whether a seizure was reasonable is, of course, highly dependant on the specific facts and circumstances of the encounter. Here, however, the analysis is not close. The government argues the officers had suspicion of Smith based on the following three factors: Smith was present in a "high-crime area" known to the officers as a location where drug deals were frequently conducted, the officers did not recognize him despite having done numerous patrols in the area, and

---

14. It is true that *Reyes* was decided prior to *Bostick.* However, *Bostick* clarified the Supreme Court's holding in *Mendenhall;* it did not change it. It clarified the standard described in *Mendenhall* particularly with regard to situations where an individual's freedom of movement was restricted by a factor independent of police conduct—a situation neither present in *Reyes* nor in this case. *See Bostick,* 501 U.S. at 436, 111 S.Ct. 2382.

15. This is not to say that *Reyes* and this case are identical. Determination of whether an individual has been seized must be made on a case-by-case basis. There were additional facts in *Reyes* that added to the finding of a seizure (a request to search Reyes' luggage contemporaneous with the question about staying in the taxi line, among other things), just as there are facts supportive of seizure here that were not present in *Reyes* (Smith being completely surrounded; no egress) the court's finding in *Reyes* is significant—that continued questioning is especially coercive where the initial answers have been truthful, and that actions which derail an individual's future plans for movement are of great significance.

his statement that he was waiting for the bus was implausible.

As discussed in detail above, this third "factor" carries no weight. I stood where the officers stopped their cruiser. I looked at the spot on the wall where Smith had sat, and then at the bus stop. I find that it was not at all surprising that someone would choose to sit where Smith sat, and any doubts the officers had about his response were completely unreasonable.

In that context, nor do the first two factors alone create reasonable suspicion.[16] In *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), the Court noted that although an individuals's presence in a "high crime area" does not meet the standard for a particularized suspicion of criminal activity, a location's characteristics are relevant in determining whether an individual's behavior is sufficiently suspicious to warrant further investigation. But the officers observed nothing suspicious about Smith's behavior—he was sitting alone on a wall at 1:30 p.m. waiting for a bus.

The officers did not observe other individuals approaching defendant in a manner that connoted drug activity (*see e.g.*, *United States v. Cook*, 277 F.3d 82, 86–87 (1st Cir.2002)) (reasonable suspicion to stop suspect after officers collectively observed secretive behavior and an apparent exchange at 1:30 a.m. in a known drug trafficking area), defendant made no unusual movements as if concealing a weapon or contraband (*see e.g.*, *United States v. Moore*, 235 F.3d 700, 704 (1st Cir.2000)) (reasonable suspicion to stop defendant who appeared to be hiding a weapon), nor did defendant appear to be nervous or anxious at the sight of the officers (*see e.g.*, *Terry*, 392 U.S. at 28, 88 S.Ct. 1868) (police observation of suspects pacing nervously and repeatedly looking into store provided reasonable suspicion that robbery was contemplated). This is not a case where the police were investigating a crime which had already been committed, and nothing about Smith's behavior gave any indication that one soon would be, without their intervention. Put simply, defendant did nothing suspicious.[17]

Certainly the fact that the officers did not recognize Smith was not enough to turn sitting alone waiting for a bus into something worthy of reasonable suspicion. The officers did not contend that they knew everyone who frequented the area, nor could they possibly contend that they were entitled to seize any individual they did not recognize simply because they were patrolling a "high crime area." [18]

---

**16.** This is not to say that the government has suggested such a low bar would be appropriate. The government has not addressed whether reasonable and articulable suspicion existed without the bus stop statement.

**17.** The Court's decision in *Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County, et al.*, —— U.S. ——, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) does not affect this analysis. In *Hiibel* the Court found that during a *Terry* stop, the defendant can be asked for identification and arrested if he refused (based on Nevada's "stop and identify" statute). The questioning about a person's identity is lawful because it follows from a stop that has already met constitutional standards, i.e.

reasonable suspicion. This case raises the question of whether the act of asking for identification can be one act of many others that defines a coercive *Terry* encounter. I conclude that it is, under the other circumstances present in this case.

**18.** It is worth noting that the officers' testimony did little to establish the corner as an area especially worthy of suspicion. Tarantino only agreed with the Assistant U.S. Attorney that he had made prior arrests in the area and was aware of other officers having done so. Griffin was only slightly more specific. When asked to clarify on cross-examination, Griffin testified that he had made several arrests "in that general area" and was aware "of several

The government's case for reasonable suspicion thus rests entirely on the argument that Smith's statement that he was waiting for the bus was implausible. Having gone to the scene and concluded not only that it was plausible but that the officers could have had no reasonable suspicion based on Smith's statement, I find that the officers lacked the necessary suspicion to justify the seizure.

## III. CONCLUSION

For all the above reasons, Quinton Smith's Motion to Suppress Evidence [document # 32] is **GRANTED**.

**SO ORDERED.**

other arrests being made by somebody else." When pressed by defense counsel, the only name Griffin could remember of an individual he had personally arrested—Antonio Taylor—he testified was arrested on an outstanding warrant uncovered during an FIO, not in the course of ongoing criminal activity. The government must do more than shout "high crime area," and expect the protections of the Fourth Amendment to slink away.