# United States Court of Appeals
## For the First Circuit

No. 04-2101

UNITED STATES OF AMERICA,

Appellant,

v.

QUINTON SMITH,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Selya, Circuit Judge,
Hill,* Senior Circuit Judge,
and Lynch, Circuit Judge.

Judith H. Mizner, Assistant Federal Public Defender, was on brief, for appellee.
Thomas E. Kanwit, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellant.

September 9, 2005

---

* Of the Eleventh Circuit, sitting by designation.

**HILL**, <u>Circuit Judge</u>.  The defendant, Quinton Smith, was arrested by Boston police officers and charged with one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  Smith moved to suppress the gun, claiming that it was seized in violation of his rights under the Fourth Amendment.  After a three-day hearing, the court granted the motion.  This appeal followed.

## I.

At approximately 1:30 p.m. on September 16, 2002, uniformed Boston Police Department officers Tarantino and Griffin were in their marked police cruiser patrolling, when they passed Smith, who was sitting on a 2-3 foot wall behind the sidewalk on Woolson Street.  The sidewalk was approximately seven feet wide.  There was a telephone pole in front of Smith and a house with a chain-link fence enclosing the side-yard behind him.

The officers passed Smith as they drove down Woolson Street.  Although both testified that they regularly patrolled the area and were familiar with the "locals," neither officer recognized Smith.  They circled the block and returned to the spot where Smith was still sitting.  Griffin leaned out the passenger window and asked Smith if he lived at the house behind him.  Smith said that he did not.  Griffin then asked Smith what he was doing sitting on the wall.  Smith responded that he was waiting for the bus that stops on the corner across the street.  Griffin asked

Smith if he meant the bus that stops approximately 100 feet across the street and around the corner from where he was sitting. Smith said yes, and Griffin asked him why he was not at the bus stop itself. Smith responded that he could catch the bus from where he was sitting.

The officers got out of their patrol car to fill out a Field Intelligence and Observation Report ("FIO").[1] Tarrantino and Griffin approached Smith and stood on either side of the telephone pole that was directly in front of him. Neither officer drew his weapon. Griffin asked Smith for identification or his name. Smith produced identification. As Griffin started back to the patrol car to run Smith's name through the mobile data terminal, Smith told the officers that they would find that he had an outstanding warrant for a motor vehicle violation. Griffin's data check revealed that Smith did, indeed, have an outstanding arrest warrant for receiving stolen property (motor vehicle license plates).

The officers then undertook to arrest Smith, who resisted by dragging the officers down the sidewalk and flailing his arms and punching. After subduing Smith, the officers searched him, finding a loaded .25 caliber automatic pistol with one round in the

---

[1] An FIO is routinely compiled by patrolling officers to record a person's name, nickname, residential address, date of birth, social security number and type of clothing worn in order to develop information on who is spending time in an area. Compliance with an officer's request for such information is voluntary.

chamber and three in the magazine in his waistband. The officers also found three plastic bags of marijuana on him.

Smith filed a motion to suppress all evidence derived from the search, contending that he was seized within the meaning of the Fourth Amendment at the time the officers approached him and requested his name or identification. He also argued that this seizure was not supported by reasonable suspicion because the only thing the officers knew at that time was that he was a black man in a high crime area.

The government argued that Smith was not seized until the police officers confirmed his admission of the outstanding warrant and attempted to arrest him. Prior to that time, the government asserts, the encounter was consensual. Since Smith was arrested pursuant to a valid warrant, the government contends that the search was incident to a lawful arrest and, therefore, the evidence is admissible.

The district court rejected these arguments, concluding that Smith was seized when the officers exited their car to further question him because, at that point, Smith reasonably believed that he was not free to refuse to answer and leave. 332 F. Supp. 2d 277, 282-83 (D. Mass. 2004). Furthermore, the court held, the seizure was unconstitutional as the officers had no reasonable suspicion to exit their patrol car to question Smith because his explanation regarding his presence there was "absolutely

-4-

plausible." Id. at 286.  Since the seizure was unconstitutional, the court held that the gun and ammunition found on Smith is inadmissible at trial.  Id.  Our review of these conclusions of law is *de novo*.  United States v. Cardoza, 129 F.3d 6, 13-14 (1st Cir. 1997).  Couching conclusions of law as findings of fact will not alter the standard of review.

## II.

While the Fourth Amendment protects against unreasonable searches and seizures, not all encounters between law enforcement officers and citizens constitute seizures.  The Supreme Court has made clear that "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."  United States v. Drayton, 536 U.S. 194, 200-01 (2002).  "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets."  United States v. Mendenhall, 466 U.S. 544 (1980) (quoting Terry v. Ohio, 392 U.S. 1, 34 (1968) (White, J. concurring).  We, too, have affirmed that the police may "approach citizens in public spaces and ask them questions without triggering the protections of the Fourth Amendment."  United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997).

On the other hand, a seizure may certainly occur without actual physical restraint.   If an officer, by means of  show of

-5-

authority, even briefly restrains the liberty of a citizen, we may conclude that a seizure has occurred. Terry, 392 U.S. at 19. In order to find a seizure, however, we must be able to conclude that coercion, not voluntary compliance, most accurately describes the encounter. Mendenhall, 446 U.S. at 554. In the absence of evidence of coercion, "otherwise inoffenseive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person." Id. at 555.

Furthermore, since most tend to feel some degree of compulsion when confronted by law enforcement officers asking questions, such discomfort cannot be the measure of a Fourth Amendment seizure. If it were, officers would effectively be barred from approaching citizens at all, absent full-blown probable cause. In Mendenhall, the Supreme Court made clear that "characterizing every street encounter between a citizen and the police as a 'seizure,' . . . would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." Id. at 554. Without the authority to approach and briefly question a citizen, "those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished. Id. (internal citations omitted).

In order to avoid such an unsatisfactory result, the Court has made clear that only when a citizen's freedom of movement is *objectively* restrained is there any foundation for invoking constitutional safeguards. Id. at 553. No seizure occurs when officers approach a citizen to ask a question unless it was objectively reasonable for that person to believe that he was compelled to stay and answer the question. Id.

Nor may we infer such belief from the fact that the person stayed to answer the question. Id. "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." INS v. Delgado, 266 U.S. 210, 216 (1984). Although a person may regret staying to answer an officer's questions, as Smith apparently does, such regret does not transform an otherwise consensual encounter into an unconstitutional seizure. Mendenhall, 446 U.S. at 556. In sum, "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." Delgado, 266 U.S. at 217.

The real question in this case, then, is not whether the police were entitled to approach Smith to ask him a few questions, but, rather, whether they did so in a manner that would have

communicated to a reasonable person that he was not free to refuse to answer and walk away. If so, Smith was seized prior to his admission regarding the outstanding warrant, and the evidence subsequently discovered was correctly suppressed by the district court.[2]

In Mendenhall, the Supreme Court described some of the circumstances whose presence led it to find permissible questioning, rather than impermissible restraint:

> The events took place in the public concourse. The agents wore no uniforms and displayed no weapons. They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents. They requested, but did not demand to see the respondent's identification and ticket.

446 U.S. at 555. The Court summarized these examples of circumstances that might indicate a seizure as (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled.[3] Id. at 554. The Court has

---

[2] The government does not argue, as it did below, that, if Smith was seized prior to the discovery of the outstanding arrest warrant, the seizure was reasonable because the officers' had articulable suspicion based upon Smith's claim to be waiting for a bus when he was sitting across the street from the stop.

[3] The district court concluded that three of these factors were present in this case: there were two officers who were "armed and in uniform;" their presence was threatening because when they exited their patrol car, "effectively they surrounded Smith and blocked his path to the bus stop." United States v. Smith, 332 F.

-8-

also made clear, however, that this list of factors is not exhaustive and no single factor is dispositive in any case. "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." United States v. Bostick, 501 U.S. 429, 439 (1991). We have consistently observed this admonition. Cardoza, 129 F.3d at 15; Young, 105 F.3d at 6.

### III.

In this case, the officers did not activate the patrol car's siren or lights. They did not summon Smith to the car, or ask him to move from his seat on the wall, or demand that he do anything. When they exited the car, the officers, although in uniform, did not unholster their weapons. They stood in the only place they could – on either side of the telephone pole directly in front of Smith. Immediately upon approaching Smith, without any further questions regarding his conduct, they asked him for identification, or his name. At this point, Smith informed the

---

Supp. 2d 277, 283 (D. Mass. 2004). Furthermore, the district court said, the officers used "an increasingly aggressive tone." Id. These circumstances indicated to the district court that "the questions were going to continue, whether Smith wanted to leave or not." Id.

officers about his outstanding arrest warrant. Smith remained seated on the wall until, after the warrant was confirmed, the officers attempted to arrest him, at which point he tried to flee.

We conclude that under the totality of these circumstances, Smith was not seized prior to his arrest. Although the two officers were armed, neither drew his weapon at any time. Neither officer ever touched Smith. They did not accuse him of any crime, or attempt to question him about a specific event. When they exited their car, the officers merely approached Smith requesting his identification, or even just his name. Such a non-threatening request does not elevate an otherwise consensual encounter between a citizen and the police into a seizure. See, e.g., United States v. Wade, 400 F.3d 1019, 1022 (7th Cir. 2005) (requests for identification do not constitute a seizure); United States v. Granillo, 288 F.3d 1071 (8th Cir. 2002); United States v. Sanchez, 89 F.3d 715 (10th Cir. 1996).

Nor was the officers' tone of voice sufficient to escalate the encounter into a seizure. Smith testified that the first question from the police ("do you live here?") had a "pretty aggressive" tone and the second question ("what are you doing there?") was voiced with sarcasm. He did not testify that the tone or content of subsequent questions escalated. We have previously held that the crucial question is whether the questions themselves communicate to the citizen that he is compelled to stay and answer.

-10-

<u>Cardoza</u>, 129 F.3d at 15-16.  In this case, the officers' questions were general and non-threatening.  Even if asked with sarcasm, they did not communicate a command to stay.

Nor did the officers restrict Smith's freedom of movement when they approached him as he sat on the wall.  Although the district court concluded that the positioning of the officers restrained Smith because "effectively they surrounded him," photographs in evidence established that they stood where they had to, given that the telephone pole was in front of Smith, and that Smith could have moved in a variety of directions, including to the bus stop, down the sidewalk, or into the side-yard behind him.

Furthermore, even if the pole and the wall created the illusion of being restrained, it must be remembered that mere physical limitations on an individual's movement, not created by police, are insufficient to turn an encounter with police into a restraint of liberty.  <u>Bostick</u>, 501 U.S. at 436.  In <u>Bostick</u>, the Supreme Court refused to find a seizure when the defendant was on a bus and police came down the aisle toward him, blocking his path.  Similarly, in <u>Delgado</u>, the Court rejected the argument that stationing federal agents at the exits of a factory rendered the subsequent questioning of the workers a seizure.  466 U.S. at 218-19.  Finally, in <u>United States</u> v. <u>Brown</u>, 169 F.3d 89, 92 (1st Cir. 1999), we held that there was no seizure when an officer confronted the defendant on a stairwell, blocking his path.  We conclude that,

-11-

to the extent that there was any apparent physical restriction of Smith's movement, it was largely a function of the physical environment and, in all events, insufficient to constitute a seizure.[4] When the freedom of movement of a person is limited by a physical obstruction not created by the police, the correct test for seizure is not "free to leave," but free to terminate the encounter by refusing to answer questions. Bostick, 501 U.S. at 436. This Smith surely could have done.

We conclude that, under all the circumstances of this encounter, an objectively reasonable person would have felt free to decline the officers' requests or otherwise terminate this encounter. Smith could have declined to provide his identification

---

[4] The dissent reaches the opposite conclusion based upon the view that the district court's findings of historical fact and inferences from these facts compel a different result. Smith, 332 F. Supp. at 283. While it is true that these findings and inferences are entitled to deference, Ornelas v. United States, 517 U.S. 690, 699 (1996), such deference does not insulate the district court's separate legal conclusion of Fourth Amendment seizure from *de novo* review. Cardoza, 129 F.3d at 14. Couching the legal conclusion of "seizure" as a finding of fact (Smith was "surrounded" and could not leave) does not alter the correct standard of review.

Our review of a lower court's disposition of a suppression motion is bifurcated: we review the court's findings of fact for clear error. Id. at 13. "Conversely, we review conclusions of law de novo, subjecting constitutional interpretations to plenary review." Id. at 14 (citing Ornelas, 517 U.S. at 697). The conclusion, reached after review of all the facts of the encounter, that a seizure triggering the protections of the Fourth Amendment has occurred is a constitutional interpretation. Id. at 13. As such, we are free to reach a different result. See Ornelas, 517 U.S. at 697 (independent appellate review of these ultimate constitutional determinations is consistent with the unitary system of law).

or answer further questions and, as the officers testified, nothing further would have happened to him. The fact that he did not terminate the encounter does not indicate that he felt restrained, or that if he did, that was an objectively reasonable reaction under the circumstances.[5]

In fact, Smith's attempt to avoid being seized by fleeing upon being arrested demonstrates that he had not been seized. To constitute a seizure, there must not only be a show of authority sufficient to make a reasonable person believe that he was not free to leave, but also submission to that authority. California v. Hodari D., 499 U.S. 621, 626-29 (1991). If a defendant manifests his belief that he has not been seized by attempting to flee, he has not submitted to a show of authority and, therefore, has not been seized. Id. Following Hodari D., we have held that in cases where the seizure depends upon a show of authority, "no seizure occurs until the suspect has submitted to that authority." United States v. Sealey, 30 F.3d 7, 9 (1st Cir. 1994); Young, 105 F.3d at

---

[5] It certainly cannot be argued that Smith's possession of the gun and ammunition establishes that it was objectively reasonable for him to believe that he was compelled to answer the officers' questions. "[T]he 'reasonable person' test presupposes an *innocent* person." Bostick, 501 U.S. at 438 ("We do reject, however, Bostick's argument that he must have been seized because no reasonable person would freely consent to a search of luggage that he or she know contains drugs"). As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to refuse to answer questions, an encounter with police officers approaching an individual to ask a few questions is consensual. United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

6 ("in the absence of an officer's exertion of physical force or an individual's submission to a show of authority, no seizure occurs").  In this case, Smith remained seated on the wall until the officers arrested him.  At that point, he fought with them and attempted to flee.  Thus, Smith's own actions indicate that he had not submitted to their authority, and, therefore, was not seized prior to that time.  Id.

**IV.**

We conclude that, under the totality of the circumstances surrounding the encounter between Smith and the officers, it was not objectively reasonable for Smith to believe that he was compelled to remain and answer the officers' questions.  The fact that he did remain does not indicate otherwise.  Accordingly, the judgment of the district court granting the motion to suppress and suppressing the evidence in this case is

REVERSED and REMANDED to the district court for further proceedings not inconsistent with this opinion.

**Dissenting opinion follows.**

**LYNCH**, <u>Circuit Judge</u>, **dissenting**. Recognizing this as a close case, I respectfully dissent. I would affirm the district court's suppression order on the ground that Smith was seized at least as of the point when, boxed in by the officers, he was asked for his identification. See <u>United States</u> v. <u>Smith</u>, 332 F. Supp. 2d 277, 283-84 (D. Mass. 2004). My difference with the majority is over application of the appellate standard of review, articulated in <u>Ornelas</u> v. <u>United States</u>, 517 U.S. 690 (1996).

The government does not challenge the district court's findings of historic fact. Nor, on appeal, does it challenge the court's ruling that the officers had no reasonable suspicion even for a <u>Terry</u> stop at any time before the seizure. See <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1, 30-31 (1968). Nor is there a claim that the district court used an incorrect legal standard. The correct standard, and the one used, is that if there is no reasonable suspicion of a crime, then the police may not, consistent with the Fourth Amendment, make a reasonable person feel that he or she is not free to leave or to terminate the encounter. See <u>Florida</u> v. <u>Bostick</u>, 501 U.S. 429, 439 (1991); <u>Michigan</u> v. <u>Chesternut</u>, 486 U.S. 567, 573-74 (1988); <u>United States</u> v. <u>Mendenhall</u>, 446 U.S. 544, 554-55 (1980) (plurality opinion). When the police do so, they have "seized" a person under the Fourth Amendment. <u>See, e.g.</u>, <u>Bostick</u>, 501 U.S. at 439.

-15-

The prosecution in this case, accordingly, chooses to fight on the ground that there was no stop at all and thus no seizure: that the appellate court should, contrary to the district court, conclude that a reasonable person in Smith's position would have felt free to leave or to terminate the encounter with the police.

**I.**

The facts, according to the district court's findings, are these. Quentin Smith, a black man, was waiting for a bus at 1:30 in the afternoon on a drizzly September day in Dorchester, a largely minority neighborhood in Boston. Because there were 8 or 10 people crowding the bus stop, which had no seats anyway, Smith walked across the street to a place where he could sit, and settled down on a three-foot-high wall. His choice of a place to wait was a good one: from there he could see the bus coming and have enough time to get back and board it, and an adjacent tree provided some shelter from the rain. See Smith, 332 F. Supp. 2d at 280-81.

The bus did not come, but a marked police cruiser did. The two officers in the cruiser patrolled this-high crime area. The officers, who knew a number of the regulars in the area, cruised by Smith and did not recognize him. They went around the block and saw him again on their return. The cruiser pulled up to the curb close to Smith. An officer leaned out of the passenger-side window, nearest Smith, and asked Smith if he lived in the

-16-

house in front of which he was sitting.  Smith answered, accurately, that he did not.  The officer asked Smith what he was doing sitting on the wall.  Smith answered that he was waiting for the bus.  The officer sarcastically asked why Smith was not actually at the bus stop.  Smith replied politely that he could catch the bus from where he was sitting.  See id. at 279-81 & n.2.

The officers testified that Smith's responses did not make sense to them because someone waiting for the bus would not be sitting where Smith was.  See id. at 280-81.  As a result, they believed that they had a basis to be reasonably suspicious of him.  That the officers believed they had reasonable suspicion is also supported by the fact that their later Incident Report stated: "[T]he officers stopped their marked [motor vehicle] to talk to the suspect and to fill out an FIO."  Id. at 281 n.10.  Officers are directed by Boston Police Department regulations to complete an FIO, or Field Intelligence and Observation Report, upon observation of "known criminals" or persons "suspected of having an unlawful design."  Id.  It is clear, then, that the officers considered Smith to be a "suspect," and that he was either a "known criminal[]" or was "suspected of having an unlawful design."  Their perception of events is the important point.

The district court, having taken a view of the scene, sat on the wall, and looked for the bus, found that it was entirely sensible for someone to wait at that spot for the bus and thus that

-17-

the officers did not in fact have reasonable suspicion of Smith. The stop was 100 feet away and could be reached in 13 to 16 seconds.  See id. at 280-81.

Although the government argues that there was no stop at all, and so no need for even reasonable suspicion, the next steps taken by the officers are indeed the steps that would be taken by officers who believed that they were authorized to detain and question someone.  The officers did not remain in the car to question Smith, as they easily could have done.  They got out of the car, prepared, if needed, to apprehend him.  See id. at 281 & n.6, n.7.  They then came physically close to Smith, apparently positioning themselves to take him into custody.  They did not stand at normal conversational distance.  The district court found that the two officers placed themselves so that each was within arm's reach of Smith; Smith testified that they were each three feet away from him.  See id. at 281.  The officers also spread themselves so one was on either side of Smith, again consistent with officers preparing to take a suspect into custody.  See id. He was seated; they were standing.  The district court found that the officers' tone became "increasingly sarcastic and aggressive" throughout the encounter.[6]  Id.  They soon asked Smith for his identification.  See id. at 282.

---

[6]  It is also true that the officers did not draw their weapons. See Smith, 332 F. Supp. 2d at 281.  They did not say anything one way or another about whether Smith was free to leave.

-18-

The officers effectively boxed Smith in, given the particular geographic features of the location where Smith was sitting. Since Smith had uneven ground, a fence, and other obstacles behind him, a telephone pole in front of him, and officers on either side of him, he literally had no way out. See id. at 281. He was not free to leave, nor was he free to terminate the encounter, as the increasingly hostile tone of the officers' questions made clear. As the district court put it:

> Although there were only two officers, their presence was threatening because effectively they surrounded Smith and blocked his path to the bus stop. It was additionally threatening because, as discussed below, they approached after he had responded truthfully to the officers' initial questions. Though holstered, both officers[] were armed and in uniform. Griffin's tone was increasingly aggressive and sarcastic throughout.
>
> Smith gave polite answers. The officers responded by closing in on him and questioning him in an increasingly aggressive tone. He told them the truth, and they became more forceful rather than less. They moved closer to him rather than further away. The timing of their approach was a signal that the questions were going to continue, whether Smith wanted to leave or not.
>
> The government has compared the officers' positions around Smith to that of two friends who had approached defendant to have a conversation with him. Their guns, uniforms, and the fact that they did not know each other aside, the circumstances under which they approached Smith would have indicated to him that this was neither a friendly nor an optional encounter.
>
> Any doubt about this was removed when Griffin asked Smith for identification, a request that Smith reasonably believed he had no choice but to answer. Putting aside the

-19-

> fact that the officers were blocking his ability to watch for the bus, much less catch the bus, Smith would not have had time to terminate the conversation with the officers, get his identification back, and still catch the bus. Griffin's "request" for identification was a clear statement: forget about the bus, you are not going anywhere.

Id. at 283.

Smith had no non-suspicious alternative to turning down the officers' inquiry.[7] The district court's conclusion was not based on the officers' mere asking of questions, nor on their merely asking for identification.[8]

**II.**

Ornelas held that Fourth Amendment conclusions of law as to a district court's determination of "reasonable suspicion" and "probable cause" are subject to a two-part standard of review:

> The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. The first part of the

---

[7] The government argued that Smith was free to leave because he could have climbed over the wall or climbed through a small opening in a fence, and so forth. As the district court noted, though, "[t]here was no meaningful egress." Id. at 281. Any such action would have been suspicious on his part.

[8] I note that none of the officers' actions would have been improper if there was objectively reasonable suspicion under Terry, and thus proper grounds for a Terry stop.

> analysis involves only a determination of historical facts, but the second is a mixed question of law and fact:  [T]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.
>
> . . . .
>
> We therefore hold that as a general matter determinations of reasonable suspicion and probable cause should be reviewed <u>de novo</u> on appeal. . . . [A] reviewing court should take care . . . to review findings of historical fact only for clear error . . . .

<u>Ornelas</u>, 517 U.S. at 690, 696-97, 699 (citation and internal quotation marks omitted; first three alterations in original). <u>Ornelas</u> therefore indicated that the district court's ultimate conclusion as to whether probable cause or reasonable suspicion existed should be reviewed de novo, although it also emphasized that the district court's historical findings of fact should be reviewed only for clear error.

The <u>Ornelas</u> Court gave several reasons for subjecting the ultimate conclusion on these two determinations -- reasonable suspicion and probable cause -- to de novo review.  The first was the need for uniformity of rules throughout the nation.  <u>See</u> <u>id.</u> at 697.  Another was that "the legal rules for probable cause and reasonable suspicion acquire content only through application." <u>Id.</u>  Finally, the Court noted that de novo review tends to "come closer to providing law enforcement officers with a defined set of

-21-

rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement." Id. at 697-98 (citations and internal quotation marks omitted). It acknowledged, though, that since the legal "mosaic" in this area is so "multi-faceted, one determination will seldom be a useful 'precedent' for another." Id. at 698 (internal quotation marks omitted).

The Ornelas Court next clarified the type of de novo review it envisioned. De novo review in this particular context is not unmindful of the district court's reasoning (nor of the reasoning of the officers); rather, the appellate court must give:

> due weight to inferences drawn from [the historical] facts found by resident judges and local law enforcement officers.
> A trial judge views the facts of a particular case in light of the distinctive features and events of the community; likewise, a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference.

Id. at 699; see also United States v. Arvizu, 534 U.S. 266, 276-77 (2002); Arvizu, 534 U.S. at 278 (Scalia, J., concurring) ("[W]e have here a peculiar sort of de novo review."); United States v. Santos, 403 F.3d 1120, 1125 (10th Cir. 2005) (noting that de novo review under Ornelas "[i]n practice . . . looks more like deference

-- indeed, double deference"); <u>United States</u> v. <u>Townsend</u>, 305 F.3d 537, 542 (6th Cir. 2002).

The issue before us is neither reasonable suspicion nor probable cause, the subjects of the <u>Ornelas</u> standard, but the subsidiary issue of whether a "seizure" occurred within the meaning of the Fourth Amendment. On this issue, the circuits, before <u>Ornelas</u>, were split.[9] Although one circuit has expressly decided to adhere to settled circuit precedent and to continue reviewing the determination of whether a seizure occurred using the "clearly erroneous" standard, <u>see</u> <u>United States</u> v. <u>Mask</u>, 330 F.3d 330, 335 (5th Cir. 2003), several circuits have cited <u>Ornelas</u> -- although generally without discussion -- as support for the proposition that the ultimate determination of whether a seizure occurred is reviewed de novo, <u>see, e.g.</u>, <u>United States</u> v. <u>Williams</u>, 413 F.3d 347, 351 (3d Cir. 2005); <u>United States</u> v. <u>Avery</u>, 137 F.3d 343, 348 (6th Cir. 1997); <u>United States</u> v. <u>Hernandez</u>, 93 F.3d 1493, 1498

---

[9]   <u>See</u> 6 W. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 11.7(c), at 448 (4th ed. 2004). The de novo standard of review on the "seizure" issue was adopted in <u>United States</u> v. <u>Buchanon</u>, 72 F.3d 1217, 1222-23 (6th Cir. 1995); <u>United States</u> v. <u>McKines</u>, 933 F.2d 1412, 1424-25 (8th Cir. 1991); <u>United States</u> v. <u>Montilla</u>, 928 F.2d 583, 588 (2d Cir. 1991); and <u>United States</u> v. <u>Maragh</u>, 894 F.2d 415, 417-18 (D.C. Cir. 1990). For decisions adopting the clearly erroneous standard of review, see, for example, <u>United States</u> v. <u>Gray</u>, 883 F.2d 320, 322 (4th Cir. 1989); <u>United States</u> v. <u>Teslim</u>, 869 F.2d 316, 321 (7th Cir. 1989); and <u>United States</u> v. <u>Archer</u>, 840 F.2d 567, 571 (8th Cir. 1988).

(10th Cir. 1996).  This circuit has never -- either before or after Ornelas – firmly addressed the question in a clear way.[10]

I will assume, for these purposes, that the district court's seizure conclusion is subject to de novo review under Ornelas.  The Supreme Court has described the "probable cause" and "reasonable suspicion" standards as mixed questions of law and fact.  See Ornelas, 517 U.S. at 696-97.  We have said in other settings that the more the issue is one of law, such as the setting of standards, the less deference is generally given to a district judge's conclusion.  See, e.g., In re Extradition of Howard, 996 F.2d 1320, 1328 (1st Cir. 1993).  The seizure determination is, at least here, quite heavily at the fact end of the spectrum.

The Supreme Court has described the ultimate seizure question -- whether a reasonable person would feel free to leave or terminate an encounter -- as highly dependent on particular facts

---

[10]  A de novo standard is perhaps suggested by the language of United States v. Cardoza, 129 F.3d 6, 13-14 (1st Cir. 1997) and United States v. Young, 105 F.3d 1, 5 (1st Cir. 1997).

In Thompson v. Keohane, 516 U.S. 99, 115-16 (1995), the Supreme Court held that the question of whether a defendant was "in custody" for Fifth Amendment purposes, and therefore must be given Miranda warnings, was a question of law and not fact for habeas purposes.  Thompson held that no presumption of correctness should be given to such determinations of state courts on habeas review.  See id. at 116.  We have cited Thompson to the effect that, "arguably," review of a Fifth Amendment "in custody" determination is de novo in a non-habeas context.  United States v. Teemer, 394 F.3d 59, 65 (1st Cir. 2005); see United States v. Fornia-Castillo, 408 F.3d 52, 63 (1st Cir. 2005) (applying de novo standard); United States v. Trueber, 238 F.3d 79, 93 (1st Cir. 2001) (same).

and circumstances.  See, e.g., Bostick, 501 U.S. at 439.  That means there are fewer policy decisions involved.  The inquiry here is in fact so "multifaceted" and fact-specific that, even as compared with reasonable suspicion and probable cause determinations, it is perhaps less likely to be valuable as a source of guidance for law enforcement.[11]  See Ornelas, 517 U.S. at 699.

> In Bostick, the Court explained:

> [I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

501 U.S. at 439.  "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation.  Moreover, what constitutes [a seizure] will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs."  Chesternut, 486 U.S. at

---

[11]  As well, since the police officer is the prime actor in the seizure, it would not be uncommon for an objective person to conclude that an officer's conduct amounted to a seizure, at the same time the officer believed his conduct to be entirely benign.  In other words, an objective observer may well believe that the police had communicated to a reasonable person that the person was not free to decline the officer's request or otherwise terminate the encounter, while the officer believed otherwise.

573; see also United States v. Cardoza, 129 F.3d 6, 15 (1st Cir. 1997) ("The test employed in this area is highly fact specific."). In making the seizure determination, the pertinent facts are myriad.

This court has never said that there can be no seizure if certain facts are not present. Indeed, Supreme Court and circuit precedent has rejected any such method of analysis. See, e.g., Bostick, 501 U.S. at 439-40 (holding that Florida Supreme Court erred in adopting per se rule that seizure occurs whenever police questioning occurs on bus, since this fails to consider totality of circumstances); Florida v. Royer, 460 U.S. 491, 506 (1983) ("We do not suggest that there is a litmus-paper test for distinguishing a consensual encounter from a seizure. . . . Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances . . . ."); Cardoza, 129 F.3d at 14-16; Young, 105 F.3d at 6. Utter disregard by an appellate court of the district court's views on whether there was a seizure could place at risk the required multi-factored, totality approach to the question.

Applying the de novo standard of review under Ornelas to seizure issues, we must still, of course, give considerable deference to the district court's historical findings of fact -- for example, where the officers stood in relation to the sidewalk and telephone pole, how much space they took up and how much room

this left Smith to get around them, and what tone of voice the officers used during the incident. These findings are reviewed only for clear error, see Ornelas, 517 U.S. at 699, and any potential challenge by the government to the district court's factual findings has not been raised on appeal and has therefore been waived, see, e.g., Diva's Inc. v. City of Bangor, 411 F.3d 30, 39 (1st Cir. 2005). We therefore must assume that the district court's historical findings of facts are all true.

A reversal here would require departure from this rule as well as the rule that appellate courts are entitled to draw conclusions of law, but not to make findings of fact. The district court distinctly did not find that the officers stood "in the only place they could -- on either side of the telephone pole directly in front of Smith." Maj. op. at 10. Indeed, the district court concluded to the contrary and held that as the encounter escalated, the officers moved in closer to Smith, obstructing his freedom of movement. Smith, 332 F. Supp. 2d at 283. In fact, the officers could have remained in the cruiser or situated themselves differently on the seven-foot-wide sidewalk. In support of its contrary fact-finding, the majority relies on its understanding of photographs of the scene. This disregards the fact that the district court was actually present at the scene, as the majority was not. Further, the photographs show that the officers had other choices as to where to position themselves.

As to another key conclusion, it is difficult to see how an appellate court could reach a different conclusion regarding the officers' tone of voice and threatening presence than did the district court, which heard the testimony of all three participants to the encounter.

The government relies on Bostick, 501 U.S. 429, and United States v. Brown, 169 F.3d 89 (1st Cir. 1999). Bostick, which employs the totality of the circumstances test, supports the district court's conclusion that Smith was free neither to terminate the encounter nor to walk away from the police. In Bostick, the defendant was a passenger on a bus scheduled to depart for a destination he wanted to reach, and thus would not leave even before the police encounter. Bostick, 501 U.S. at 436-37. Here, the defendant, before the officers blocked him in, was perfectly free to leave. The government admits "[t]he physical setting of Smith's encounter with the officers did not approach the restrictiveness of the physical setting in Bostick." The government argued only that "limitations which were not created by the police . . . are insufficient to make an encounter with police a seizure." The government is quite correct, but the argument is misplaced, and the district court did not say otherwise. Here, physical limitations did not create the seizure; the police did. Brown likewise would not cause a reversal here. The defendant

there did not claim to be seized until he assaulted the officer. Brown, 169 F.3d at 92.

For the reasons explained above, we must also follow particularly carefully -- in this context -- the Ornelas Court's dictate to give "due weight" to inferences drawn by the trial judge from the historical facts and to the perceptions of the officers. See Ornelas, 517 U.S. at 699. In Arvizu, for instance, a "reasonable suspicion" case, the Supreme Court applied this principle to give deference to the district court's inferences that certain individuals' method of waving was "'methodical,' 'mechanical,' 'abnormal,' and 'certainly . . . a fact that is odd and would lead a reasonable officer to wonder why they are doing this.'" 534 U.S. at 276-77. Similarly, the various intermediate factual inferences made in this case by the district court, which heard the witnesses and saw the scene, are entitled to deference. These include, for example, inferences about the threatening nature of the encounter, that Smith had "no meaningful egress" from his spot on the wall once the officers had approached because his possible escape routes would have seemed suspicious, and that the officers' request for Smith's identification, at the time they asked for it, was a "clear statement: forget about the bus, you are not going anywhere." See Smith, 332 F. Supp. 2d at 282-83.

The government argues that Smith's confinement was self-imposed: he remained where he was because he wanted to catch the

bus to go home, and the bus shelter was already crowded. It is odd to think that a person must be put to a choice under the Fourth Amendment between catching a bus to go home and terminating an encounter with the police. Once the officers requested Smith's identification, Smith knew he could not catch a bus while the police had his identification. Thus, the district court's inference about the meaning of the officers' request for Smith's identification makes sense. See id. at 283.

These inferences of the district court must be coupled with the indications that the officers themselves saw the situation as one where they had reasonable suspicion to at least engage in a Terry stop. The officers' actions were entirely consistent with a seizure based on reasonable suspicion, which explains their failure to approach Smith in a way which communicated that he was free to leave.

According the respect due under Ornelas to the district court's findings of historical fact and inferences from these facts, and to the actions of the officers based on their beliefs that they had reasonable suspicion, and applying de novo review, I would affirm the district court's suppression order.